# United States Court of Appeals
## For the First Circuit

No. 10-2421

FIDELITY INTERNATIONAL CURRENCY ADVISOR A FUND, LLC,
by the Tax Matters Partner,

Plaintiff, Appellant,

v.

UNITED STATES OF AMERICA,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor IV, U.S. District Judge]

Before
Torruella, Boudin and Thompson,
Circuit Judges.

William F. Nelson with whom Ronald L. Buch, Jr., David J. Curtin, Kiara L. Rankin and Bingham McCutchen LLP were on brief for appellant.
Judith A. Hagley, Tax Division, Department of Justice, with whom Richard Farber, Tax Division, Department of Justice, Gilbert S. Rothenberg, Acting Deputy Assistant Attorney General, and Carmen M. Ortiz, United States Attorney, were on brief for appellee.

October 21, 2011

**BOUDIN**, **Circuit Judge**. Fidelity International Currency Advisor A Fund ("Fidelity") seeks review of a district court judgment resolving a controversy between Fidelity and the Internal Revenue Service ("IRS"). In substance, the district court sustained IRS adjustments to Fidelity's partnership returns for the two tax years at issue and upheld a 40 percent penalty for tax underpayment. Fid. Int'l Currency Advisor A Fund, LLC v. United States, 747 F. Supp. 2d 49 (D. Mass. 2010).

The litigation arises out of the following events. Richard Egan was the founder of EMC Corporation, a manufacturer of computer storage devices, and in the early years of this ultimately successful business, Egan received non-qualified options to acquire EMC stock. When he exercised those options in 2001, they generated $162 million of ordinary income for him and his wife; it was estimated this could create a tax liability of over $63 million.

Prior to exercising the options, Egan met with various accounting and law firms to discuss methods of reducing the potential tax liability. Ultimately, the plan adopted and put into effect required Egan to form a partnership with a foreign national; that partnership would engage in transactions that would generate largely offsetting gains and losses without net risk; the gain component would be principally allocated to the foreign national; the loss component would be principally allocated to Egan and used

-2-

on his individual return to offset gains on his exercise of the EMC stock options, virtually eliminating tax on those gains.

To this end, in July 2000 Egan formed Fidelity as a limited liability company federally taxed as a partnership. Egan was one partner; the other principal partner was Samuel Mahoney, who was an Irish citizen. Common shares were initially assigned 93 percent to Mahoney and 5 percent to Egan; Egan contributed $2.7 million in cash and certain interest rate options valued at $1.6 million, and Mahoney contributed $651,000 in cash.

Then, in October 2001, Fidelity entered into a set of transactions whereby it purchased and sold options, related to foreign currency exchange rates and configured in pairs: the terms set for each pair (as to premium, strike price, maturity dates, and possible payout) assured that a loss on one option in a pair would be offset by a corresponding gain on the other. In substance, the transaction would provide virtually no opportunity for a net gain but also no risk of a net loss.[1]

One week later, Fidelity terminated four of the options that had gained in value due to fluctuations in the currency exchange rates. The offsetting options in the pairs, correspondingly reduced in value, were not terminated. Instead,

---

[1]Imagine two bets placed on the temperature next Wednesday, such that the wagerer would earn $1 on the first bet but also pay $1 on the second if the temperature was above the date's historic average. If instead the temperature fell below that average, the wagerer would lose $1 on the first bet and win $1 on the second.

the proceeds from the terminated options were used to purchase replacement options that would ensure that the eventual losses taken by the partnership when it terminated the original options that had lost value and the replacement options would offset the gains initially realized.

This generated net taxable gains on Fidelity's books of about $174 million from the options that had been terminated. But under the tax laws Fidelity pays no taxes; rather its gains and losses are assigned to the partners in accordance with their ownership shares in the partnership and taxed to the partners on their own returns. 26 U.S.C. §§ 701-702 (2006). Because of the then-existing 5 and 93 percent share allocation, Egan was assigned $7.1 million net gain and Mahoney $163.3 million net gain.

Then, a week later, in early November 2001, Egan bought 88 percent of the common partnership interest from Mahoney for $325,500 and so owned 93 percent with Mahoney being reduced to 5 percent. A month later, in early December, Fidelity terminated the four remaining original foreign currency options as well as the replacement options acquired immediately after the October termination. Not surprisingly in light of the design of the option pairs, the December loss ($178.1 million) only modestly exceeded the original gain.

Fidelity now allocated the $178.1 million loss in proportion to the reallocated ownership shares: Egan was allocated

-4-

$165.8 million in loss and Mahoney $8.8 million.  The net economic loss to the partnership from all the offsetting foreign currency options was just over half a million dollars; advisory fees brought the total cost to $4.1 million--a cost dwarfed by the potential tax benefits for Egan.

The gains and losses from the currency option transactions were reported on the 2001 partnership return and the associated forms allocating to Fidelity's partners the gains or losses for the transactions.  Almost all the losses were assigned on the schedule to Egan.  An attached schedule reflecting "Other income (loss)" pertaining to each closed-out transaction--say, the purchase and ultimate disposition of an option by Fidelity--showed a "cost or other basis" for the option (such as the premium paid to acquire it), the associated revenue generated (the price received on its sale) and the difference (the net gain or loss on the purchase and sale).

The ultimate effect of these 2001 currency option transactions was to give Egan a net loss on paper of $158.6 million (comprising 5 percent of the gain from the foreign currency options, 93 percent of the loss, and fees) and Mahoney a net gain of $154.5 million (including 93 percent of the gain, 5 percent of the loss, and fees).  Egan's net loss was reported on his 2001 personal return to offset gain on the nearly $163 million in income realized from the exercise of his EMC options in the same year.

These 2001 foreign currency options transactions were the core means of generating the loss for Egan, but a related set of transactions was also necessary. Under the tax laws, a partner may deduct his share of a partnership's losses only to the extent of his adjusted "outside" basis in the partnership at the end of the year in which the loss occurred. 26 U.S.C. § 704(d). This outside basis refers to the partner's investment in the partnership (as opposed to the "inside" basis of investments made by the partnership in carrying on its own business).

To establish this necessary large outside basis, Egan in 2000 had become a partner not only of Fidelity but of a second vehicle called Fidelity World, which in early October 2001 entered into two pairs of offsetting options keyed to interest rates. Fidelity World contributed them to Fidelity, reporting as a capital contribution by Egan the $150 million cost of premiums paid to secure the future interest rates options (and ignoring largely offsetting premiums received for the sale of the other two options).

In 2001, Fidelity closed out the contributed interest rate options by purchasing a set of offsetting options that locked in any existing gain or loss to protect against any future changes. When these options were all terminated in 2002, the transactions produced a very modest net loss of $1.9 million, due primarily to advisor fees; nearly $1.8 million was proportionally allocated to

Egan on Fidelity's 2002 return and reported by him to shield other income on his own 2002 tax return.

In 2005 and 2006, the IRS notified Fidelity that it was making adjustments to Fidelity's 2001 and 2002 partnership tax returns. Under the governing regime, the partnership return items may be adjusted by the IRS and contested changes may be judicially reviewed in a district court proceeding (or, the Tax Court or Court of Federal Claims) addressed only to partnership items. 26 U.S.C. § 6226(a). These include "the proper allocation of such items among the partners, and the applicability of any penalty . . . which relates to an adjustment to a partnership item." Id. § 6226(f).

In this case, the IRS disallowed all of Egan's claimed contributions to Fidelity, reduced Egan's claimed "outside partnership basis" to zero for 2001 and--most importantly-- disallowed the losses on Fidelity option transactions that Egan had used on his personal returns for 2001 and 2002 to shield his non-Fidelity income. The adjustments rested on the IRS's determination that the option transactions, and Egan's contribution, lacked economic substance. The IRS also disregarded the partnership as a sham and lacking in economic substance.

Tax considerations are permissibly taken into account by taxpayers in structuring their financial transactions, but where a transaction has no economic purpose other than to reduce taxes, the

IRS may disregard the reported figures as fictions and look through to the underlying substance.[2] Here, the IRS found (and the district court later agreed) that Fidelity's option transactions were designed to cancel each other out and were merely reported to generate paper losses to use on Egan's return. The shift in partnership ownership part way through was a counterpart device to allocate most losses to Egan and most gains to Mahoney.

Congress has adopted a graduated set of penalties for overstating on a return the value or basis of property, and the IRS invoked a provision adding a 40 percent penalty to the portion of a tax underpayment that is "attributable to" a "gross valuation misstatement." 26 U.S.C. § 6662(a), (b), (e), (h). A gross valuation misstatement occurs when

> the value of any property (or the adjusted basis of any property) claimed on any return of tax . . . is 400 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be) . . . .

Id. § 6662(e)(1)(A), (h)(2)(A)(ii)(I). Under the regulations, a gross valuation misstatement exists when the correct or adjusted basis of property is zero. 26 C.F.R. § 1.6662-5(g) (2011).

The losses that Fidelity attributed to individual transactions were calculated by assigning each option transaction

---

[2]See 26 U.S.C.A. § 7701(*o*) (West 2011); Gregory v. Helvering, 293 U.S. 465 (1935); Dewees v. Comm'r, 870 F.2d 21, 29-30 (1st Cir. 1989).

-8-

a cost basis or value to set against any revenue obtained from the transaction. Absent a cost basis or value, the transaction could not generate a loss. And when the IRS found that the transactions lacked economic substance, it not only disallowed the loss but invoked penalties for misstating the basis of the options.

To understand the target of the penalty, a simplified example may help. Basis, in a typical business purchase and sale transaction, equates to the cost (reduced by any depreciation). Thus, a taxpayer might claim that the cost of a widget was $10-- when its actual cost was $1--and report its sale for $1. Overstating the cost of the widget allowed the taxpayer to claim a loss of $9, then used to reduce taxes on other income. So falsely asserting, or increasing, a basis translates into reducing gain or enlarging loss by the amount falsely asserted or increased.

Similarly, in this case, the reported basis in the options transactions allowed Fidelity to report a loss (which it allocated to Egan). An excerpt from a table attached to Fidelity's Form 1065 to show "Other Income/(Loss)" read as follows (the line below references a single option transaction):

| Date Acquired | Date Sold | Gross Sales Price | Cost or Other Basis | Gain/(Loss) |
|---|---|---|---|---|
| 10/22/2001 | 12/03/2001 | 163,405,260 | 199,865,888 | (36,460,628) |

The huge loss taken by Egan on his own return was comprised of the sum of a number of such losses listed in the partnership return and allocated to him.

Here, the IRS concluded that the 40 percent penalty applied. On judicial review, the district court upheld this and other determinations, making numerous factual findings and legal determinations. Fid. Int'l, 747 F. Supp. 2d 49. Having agreed with the IRS that the option transactions lacked economic substance, the court held that the losses attributed to Egan were properly disallowed. The 40 percent penalty rested on determinations that the correct basis of those transactions was zero, and that tax underpayments were attributable to those overstatements. Id. at 239 ¶ 68k.

Fidelity's present appeal is narrow. Apart from a throw-away line or so in its brief, Fidelity does not seriously contest the district court's basis adjustment under the economic substance doctrine. Nor does it appeal the applicability of alternative lower penalties based on the spurious paper losses generated. Instead, its arguments are directed only to the 40 percent penalty. Although Fidelity is the nominal private party, this is effectively a controversy between the Egan estate and the government.

The three issues Fidelity presents are legal and our review is de novo. See Keller v. Commissioner, 556 F.3d 1056, 1058-59 (9th Cir. 2009). The first claim is that there was no

"misstatement" of basis in the partnership returns. Second, Fidelity argues that no underpayment of tax was "attributable to" a basis misstatement, even if a misstatement existed. Finally, Fidelity says that the 40 percent penalty is inconsistent with congressional tax policy as evidenced by a new penalty provision.

The "No Misstatement" Claim. Fidelity's position on the first issue has two separate strands. One is that there was no improper statement of loss on the partnership return because the net economic loss of $4.1 million reported on its 2001 return was almost identical to the true net economic loss as computed by the district court. But this is merely to say that any misstatements of individual transactions might not have had any effect on Fidelity's taxes if it were the taxpayer.

Here, the misstatements of concern are not the net effect of the transactions taken together but the claimed bases on individual options transactions. These bases, and the allocation of the resulting losses to an individual partner, are themselves partnership items subject to the IRS's adjustment power in reviewing the partnership return.[3] It was these individual transactions that allowed Egan to offset ordinary income on his own

---

[3]IRS regulations state that "[c]ontributions to the partnership" and a partner's share of "income, gain, [and] loss" are partnership items, 26 C.F.R. § 301.6231(a)(3)-1 (2011). See also Stobie Creek Invs. LLC v. United States, 608 F.3d 1366, 1380 (Fed. Cir. 2010).

returns; and the individual transactions were just those that the IRS found to lack economic substance.

The fact that gains and losses would inevitably balance out is just what made the transactions lack economic substance for Fidelity. There might or might not have been different counter-parties to the individual transactions who could therefore suffer "real" gains or losses themselves. But for Fidelity, the transactions had no function but to create artificial paper gains on some transactions (principally assigned to Mahoney) and losses on others (principally assigned to Egan).

Fidelity's second-strand argument seeks to distinguish between factually false transactions--ones that never occurred--and the present case in which the transactions actually occurred but, taken together, had no economic substance for Fidelity. In the latter case, says Fidelity, the economic substance doctrine allows the IRS to disregard the transactions but the reported figures remain accurate recordations of each transaction and are not misstatements, although (it says) a "legal dispute" might arise as to their significance.

Congress singled out for stiff penalties a misstated basis or value that improperly reduces taxes; the apparent reason is that the misstated figures directly impair tax collections and

prove difficult to resolve (and presumably are easy to fabricate).[4] Here, the figures are misstatements precisely because the transactions lacked any economic purpose for Fidelity other than to generate purported losses to reduce Egan's taxes. Purpose, at least in this case, is an issue of fact quite as much as whether an option was bought or sold.

Relatedly, Fidelity argues that the valuation misstatement penalty only applies in cases where the economic substance doctrine is triggered because basis or value is misstated, and not where the basis for the transaction is reduced to zero after a finding of lack of economic substance. But this is a distinction without a difference; and in any case, the statute by its terms applies the penalty to a misstatement, and given the policy concerns Congress had no reason to care about the nature of the falsity.

The "Attributable To" Issue. Under the penalty statute, the 40 percent penalty applies only to "a portion of the underpayment . . . attributable to one or more gross valuation misstatements." 26 U.S.C. § 6662(h)(1). Fidelity argues that the underpayment of taxes by Egan--the partnership pays none for itself--would have occurred without the misstatements of value and

---

[4]See Todd v. Commissioner, 862 F.2d 540, 542 (5th Cir. 1988); Clearmeadow Investments, LLC v. United States, 87 Fed. Cl. 509, 531 n.27 (2009); H.R. Rep. No. 97-201, at 243 (1981).

therefore cannot be "attributable to" any supposed gross valuation misstatement.[5]

Fidelity says that even without the misstatements of bases, the losses Fidelity claimed and allocated to Egan would have been disallowed based on other determinations made by the IRS and the district court. Specifically, these included determinations-- stemming from the same central finding that the transactions lacked economic purpose and was designed purely for tax avoidance--that Fidelity was not a true partnership, that Egan's outside basis was zero, that Mahoney (the Irish national) was not a partner, and that the transactions were not entered into for profit, 26 U.S.C. § 165(c)(2). Fid. Int'l, 747 F. Supp. 2d at 244.

Thus, given the lack of economic substance, the IRS had various statutory grounds for disallowing the same losses. Dual cause issues arise in various contexts throughout the law, e.g., W. Page Keeton et al., Prosser and Keeton on Torts §§ 41-42 (5th ed. 1984), and the varying solutions depend primarily on context and underlying policy. Here, Congress' phrase "attributable to" is

---

[5]The district court only had jurisdiction over "the applicability of any penalty . . . which relates to an adjustment to a partnership item," 26 U.S.C. § 6226(f), and Egan's personal liability will be assessed in a separate, partner-level proceeding, but the IRS must issue a notice to the partnership before making assessments against individual partners. Id. § 6225(a). Courts seem willing to assume that a partnership adjustment is likely to produce an underpayment at the partner level. See, e.g., Am. Boat Co. v. United States, 583 F.3d 471, 473 (7th Cir. 2009).

easily read to cover the role of the misstatements in lowering Egan's taxes and that reading serves the underlying policy.

To repeat, the heavy penalty for gross misstatements of value or basis reflects their resulting harm and difficulty in detection. See note 4, above. The misstatements were the vehicle for generating the spurious Fidelity losses carried over to Egan's return to shield his income. That (in this case) alternative grounds with lower or no penalties existed for disallowing the same claimed losses hardly detracts from the need to penalize and discourage the gross value misstatements.

Indeed, one might think that it would be perverse to allow the taxpayer to avoid a penalty otherwise applicable to his conduct on the ground that the taxpayer had also engaged in additional violations that would support disallowance of the claimed losses. Cf. Gilman v. Comm'r, 933 F.2d 143, 150 (2d Cir. 1991), cert. denied, 502 U.S. 1031 (1992). Most circuit courts that have confronted variations on Fidelity's argument in the lack of economic substance context have rejected it.[6]

The only unimpaired circuit precedents favoring Fidelity's position are from the Fifth Circuit. In Todd v.

_____

[6]Compare Merino v. Comm'r, 196 F.3d 147 (3d Cir. 1999); Zfass v. Comm'r, 118 F.3d 184 (4th Cir. 1997); Illes v. Comm'r, 982 F.2d 163 (6th Cir. 1992), cert. denied, 507 U.S. 984 (1993); Gilman v. Comm'r, 933 F.2d 143 (2d Cir. 1991) cert. denied, 502 U.S. 1031 (1992); Massengill v. Comm'r, 876 F.2d 616, 619-20 (8th Cir. 1989) with Keller v. Comm'r, 556 F.3d 1056 (9th Cir. 2009); Heasley v. Comm'r, 902 F.2d 380 (5th Cir. 1990).

-15-

<u>Commissioner</u>, 862 F.2d 540 (5th Cir. 1988), later summarily followed by <u>Heasley</u> v. <u>Commissioner</u>, 902 F.2d 380 (5th Cir. 1990), the court accepted the position that an overvaluation underpinning claimed tax benefits should go unpenalized because other grounds also existed for imputing the same higher income to the taxpayer. We think <u>Todd</u> rests on a misunderstanding of the sources relied on.

The court reached its result not by considering how the "attributable to" language should be read in light of its purpose (in fact, it admitted that its reading "ascribe[s] an intent to Congress which might, at first blush, seem inequitable," <u>Todd</u>, 862 F.2d at 545) but rather because it glossed that requirement by reading language in a congressional tax document generated to explain the predecessor penalty to section 6662 passed in 1981. This document's key language reads as follows:

> The portion of a tax underpayment that is attributable to a valuation overstatement will be determined after taking into account any other proper adjustments to tax liability. Thus, the underpayment resulting from a valuation overstatement will be determined by comparing the taxpayer's (1) actual tax liability (i.e., the tax liability that results from a proper valuation and which takes into account any other proper adjustments) with (2) actual tax liability as reduced by taking into account the valuation overstatement. The difference between these two amounts will be the underpayment that is attributable to the valuation overstatement.

Todd, 862 F.2d at 542-43 (quoting Staff of the Joint Committee on Taxation, General Explanation of the Economic Recovery Tax Act of 1981, at 333 (Comm. Print 1981)).

In our view, that language is designed to avoid attributing to a basis or value misstatement an upward adjustment of taxes that is underlined to the overstatement but due solely to some other tax reporting error (for example, if Egan had also falsely claimed a charitable contribution on his return).  This is surely what the quoted language means in excluding from the overstatement penalty increased taxes due to "any other proper adjustments."  This is quite different from excusing an overstatement because it is one of two independent, rather than the sole, cause of the same under-reporting error.

Although the Ninth Circuit followed Todd's misreading in Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), a later decision of the court conceded that Gainer was a vulnerable precedent in conflict with other circuits; but the panel felt compelled to follow prior circuit precedent.  Keller, 556 F.3d at 1061.  We follow without hesitation the dominant view of the circuits that have addressed this issue.

The Supposedly Conflicting Penalty Provisions. Fidelity finally points to Congress' recent provision adding transactions lacking economic substance to the list of tax underpayments to which accuracy-related penalties apply.  26 U.S.C.A. § 6662(b)(6)

-17-

(West 2011).  This new provision, applying only to transactions entered into after March 31, 2010, Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 1409(e)(2), 124 Stat. 1029, 1070 (2010), applies a 40 percent penalty to those transactions which are not disclosed and reduces it to 20 percent for those that are, 26 U.S.C.A. § 6662(i) (West 2011).

Here, the individual Fidelity transactions at issue were, in one sense at least, disclosed.  On this premise, Fidelity alleges a potential conflict created by reading the gross valuation misstatement penalty to cover a disclosed transaction that lacks economic substance: the incentive to disclose created by the new provision is greatly reduced because the government could presumably seek the 40 percent penalty under the gross valuation misstatement provision for a fully disclosed transaction that lacked economic substance.

The new statute was enacted after the transactions that are in issue in this case, and  Fidelity does not claim that it governs those transactions.  So this is not even a case in which one can argue that two provisions apply simultaneously to the same transaction and that one provision's language should be reinterpreted to avoid an unreasonable result.  Fidelity is in effect arguing that the language in the earlier statute should be re-read because of other changes by a later Congress.

Anyway, the new provision is not limited solely to misstatements of basis or value, which Congress earlier singled out in imposing the higher penalty without regard to disclosure. And the new penalty is a strict liability provision, while the gross valuation misstatement penalty allows taxpayers to raise reasonable cause and good faith defenses. 26 U.S.C. § 6664(c)(1)-(2) (West 2011). The two penalty provisions are designed differently but create no such conflict as would lead us to tamper with straightforward language of the 40 percent penalty provision.

Affirmed.