PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2275
_____

NEAL CRISPIN,
                                        Appellant
                    v.

COMMISSIONER OF INTERNAL REVENUE

_____

On Appeal from the United States Tax Court
(No. 28980-07)
Judge:  Hon. Diane L. Kroupa
_____

Argued
January 8, 2013

Before:   RENDELL, FISHER, and JORDAN, *Circuit
Judges*.

(Filed: February 25, 2013)
_____

George W. Connelly    [ARGUED]
Chamberlain, Hrdlicka, White, Johnson & Williams
1200 Smith Street
1400 Citicorp
Houston, TX   77002
        *Counsel for Appellant*

Gary R. Allen
Tamara W. Ashford
Richard Farber
Judith A. Hagley   [ARGUED]
Gilbert S. Rothenberg
United States Department of Justice
Tax Division
950 Pennsylvania Avenue, NW
P.O. Box 502
Washington, DC   20044

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Neal D. Crispin appeals the decision of the United States Tax Court that he was not entitled to an ordinary loss deduction for his participation in a Custom Adjustable Rate Debt Structure ("CARDS") transaction and that he is liable for an accuracy-related penalty under § 6662 of the Internal Revenue Code ("I.R.C.").[1]   The Tax Court disallowed the

_____

[1] All references to the I.R.C. correspond to sections of Title 26 of the United States Code (2001).

claimed loss on the grounds that Crispin's CARDS transaction lacked economic substance and held that he could not avoid the penalty because he had not relied reasonably or in good faith on the advice of an independent and qualified tax professional. For the following reasons, we will affirm.

## I.      Background

### A.      *Facts*

Crispin is a businessman who has engaged in various enterprises over the years, some through his wholly-owned S-corporation, Murus Equities, Inc. ("Murus"). Among other things, he has been involved in leasing, structured finance, aircraft acquisition, and mortgage-backed securities investing. He practiced as a certified public accountant and served as chief financial officer of an energy company, before pursuing opportunities in structured finance and aircraft leasing. Crispin has had long and varied experience with tax matters, including tax shelters.

Since 1989, Crispin has been in the business of purchasing and leasing commercial turboprop aircraft through investment syndicates. According to Crispin, his aircraft leasing business purchases used aircraft costing between $1 million and $10 million and leases them for approximately ten years before reselling them. Prior to his participation in the CARDS transaction that is the subject of this appeal, Crispin had identified three aircraft (the "Aircraft") that he expected would be available for purchase in 2002 and that he says he planned to have Murus purchase.[2]

---

[2] Crispin conducted his aircraft leasing business

A CARDS transaction is a tax-avoidance scheme that was widely marketed to wealthy individuals during the 1990's and early 2000's. It purports to generate, through a series of pre-arranged steps, large "paper" losses deductible from ordinary income. First, a tax-indifferent party, such as a foreign entity not subject to United States taxation, borrows foreign currency from a foreign bank (a "CARDS Loan"). Then, a United States taxpayer purchases a small amount, such as 15 percent, of the borrowed foreign currency by assuming liability for a an equal amount of the CARDS Loan. The taxpayer also agrees to be jointly liable with the foreign borrower for the remainder of the CARDS Loan and so the taxpayer purports to establish a basis equal to the entire borrowed amount.[3] Finally, the taxpayer exchanges the

_____

through a separate company, AeroCentury Corp., of which he was the chairman and chief executive officer. It is unclear from the record whether Crispin had previously used Murus to engage in aircraft leasing.

[3] The Commissioner contends that that step in the CARDS transaction "is predicated on an invalid application of the ... basis provisions of the Internal Revenue Code." (Appellee's Br. at 4.) Specifically, I.R.C. § 1012 provides that a taxpayer's basis in property is generally equal to the purchase price paid by the taxpayer. That purchase price includes the amount of the seller's liabilities assumed by the taxpayer as part of the purchase, on the assumption that the taxpayer will eventually repay those liabilities. *See Comm'r v. Tufts*, 461 U.S. 300, 308-09 (1983) (noting that a loan must be recourse to the taxpayer to be included in basis). But in a CARDS transaction, the Commissioner argues, the taxpayer and the foreign borrower agree that the taxpayer will repay only the portion of the loan equal to the amount of currency

4

foreign currency he purchased for United States dollars. That exchange is a taxable event, and the taxpayer claims a loss equal to the full amount of his supposed basis in the CARDS Loan, less the proceeds of the relatively small amount of currency actually exchanged. The taxpayer uses that loss to shelter unrelated income.[4]

CARDS marketing materials describe the transaction as providing "financing" to the taxpayer. However, there is no net cash available to the taxpayer, because the foreign bank requires that all of the currency purchased with the proceeds of the CARDS Loan (including the portion purchased by the taxpayer) remain at the bank as collateral for the CARDS Loan. The taxpayer only has access to the proceeds of the CARDS Loan if he delivers to the bank an equal amount of cash, cash equivalents, or other collateral acceptable to the bank.

In 2000, prior to the events involved in this case, the Internal Revenue Service ("IRS") warned taxpayers about taking tax deductions based on artificial losses generated by inflated bases in certain assets. *See* Notice 2000-44, 2000-2 C.B. 255 (Aug. 13, 2000) ("Tax Avoidance Using Artificially High Basis"). The Notice containing that warning said that the IRS would not recognize transactions that created an artificially high basis if they lacked economic substance or a valid business purpose. After the IRS discovered the

the taxpayer actually purchases.

[4] The general structure of a CARDS transaction is well and thoroughly set forth in *Gustashaw v. Commissioner*, 696 F.3d 1124, 1127-28, 1130-31 (11th Cir. 2012).

widespread use of CARDS, and before Crispin had filed the tax return at issue in this case, the IRS issued another Notice specifically addressed to CARDS transactions and explaining their technical flaws. *See* Notice 2002-21, 2002-1 C.B. 730 (Mar. 18, 2002) ("Tax Avoidance Using Inflated Basis"). The IRS also imposed disclosure obligations on CARDS promoters and users. Eventually, the IRS announced a settlement initiative that allowed CARDS users to avoid penalties for gross valuation misstatements applicable under I.R.C. § 6662, provided that they conceded their CARDS-related tax benefits and agreed to pay a reduced penalty. *See* Announcement 2005-80, 2005-2 C.B. 967 (Oct. 28, 2005). Some 2,000 taxpayers elected to settle, paying roughly $2 billion in back taxes.

The CARDS transaction at issue in this case was used by Crispin to shelter more than $7 million of income for the 2001 tax year. He learned of the CARDS opportunity from Roy Hahn, the founder of Chenery Associates, Inc. ("Chenery"), which promoted CARDS and other tax shelter transactions. Crispin claims that Hahn approached him at a time when he (Crispin) planned to have Murus acquire the Aircraft but had not yet arranged financing for that purchase. Hahn proposed to Crispin that he enter into a CARDS transaction that Chenery had designed for another client who had decided not to proceed. In that transaction, a foreign entity would enter into a 30-year CARDS Loan denominated in a Swiss francs; the loan proceeds would be retained by the lender; Crispin would purchase 15 percent of the foreign currency obtained through the CARDS Loan, and he would agree to be jointly and severally liable for the entire CARDS Loan; he would agree to repay the principal at the maturity date; and he would exchange the foreign currency he

6

purchased for United States dollars, claiming as his basis the full amount of the CARDS Loan and garnering a tax loss equal to 85 percent of the total loan value. Hahn also provided Crispin with a sample tax opinion blessing the transaction.[5]

Crispin decided to proceed with the transaction. He also informed his partner in the mortgage securities business about the CARDS transaction, and the partner agreed to participate as well, with Murus taking a one-third share equal to Crispin's share in that business, and the partner taking the remaining two-thirds. Crispin advised Chenery that Murus would realize $7.6 million in income in 2001 from the mortgage securities business, and the transaction that Chenery

---

[5] Crispin claims that the CARDS transaction proposed to him had attractive characteristics beyond the tax benefits. He says that the terms of the loan were already negotiated and documented, the loan was available at a time when new loans for the aviation industry were scarce, and the interest rate on the loan was tied to a Swiss benchmark rate that was lower than other comparable interest rates. He also says that, although only cash and cash equivalents were acceptable as collateral for the proposed CARDS Loan, he anticipated being able to substitute the Aircraft for cash as collateral after the expected purchase of those planes in 2002. Crispin also claims that he spoke with a representative of the proposed lender who said that aircraft would be favorably considered in place of cash as collateral for the CARDS Loan, although the collateral substitution would have to be approved by the bank's credit committee.

designed generated losses that were almost exactly equal to both partners' 2001 income from that business.[6]

Chenery arranged the CARDS transaction with Croxley Financial Trading LLC ("Croxley") serving as the foreign borrower[7] and Zurich Bank and its affiliates (collectively "Zurich") as the lender. In early December 2001, Zurich loaned 74 million Swiss francs to Croxley for a stated 30-year term but callable and repayable at any time after the first year. The proceeds of the CARDS Loan were

_____

[6] Crispin again emphasizes that his CARDS transaction had already been designed for another Chenery client who had decided not to proceed, and that he "never requested a specific 'loss' deduction from Chenery." (Appellant's Opening Br. at 10.) He further asserts that he offered his partner a two-thirds participation in the transaction because he was only able to utilize one-third of the CARDS Loan that had already been arranged by Chenery its other client. However, there is no evidence in the record that the amount of the CARDS Loan, or any of the other amounts involved in the transaction, were fixed prior to the decision by Crispin and his partner to proceed.

[7] Croxley is a Delaware limited liability company with executive offices in the Cayman Islands. Its sole member is Dextra Bank & Trust Co. Ltd., a private bank organized under the laws of the Cayman Islands. For U.S. tax purposes, a single-member limited liability company is disregarded as an entity separate from its owner. Treas. Reg. § 301.7701-3(b)(1)(ii). Consequently, Dextra Bank, through Croxley, functioned as the foreign borrower in Crispin's CARDS transaction.

transferred to Croxley's account at Zurich and pledged to Zurich as collateral for the loan. In late December 2001, Croxley sold Crispin 4.8 million Swiss francs (the "loan assumption proceeds") in exchange for Crispin's agreement to be jointly and severally liable for a share of Croxley's loan obligations to Zurich with a value of $9.4 million.[8] Crispin immediately transferred the loan assumption proceeds to the Zurich account of Murus, which in turn guaranteed Crispin's loan obligations, and which pledged the Swiss francs to Zurich as collateral for the loan. On the same day, Murus exchanged 3.1 million Swiss francs for United States dollars. Murus received $1.8 million, which it used to purchase a Zurich promissory note that matured at the end of one year and that was held by Zurich as collateral for Murus's guaranty of Crispin's obligations on the CARDS Loan.[9]

---

[8] At the time of the transaction, the exchange rate was approximately 1.7 Swiss francs per 1 U.S. dollar. (*See* Supplemental App. at 136 (noting the exchange rate as 0.59 U.S. dollars per 1 Swiss franc).)

As discussed above, a CARDS transaction effectively involves two separate agreements by the U.S. taxpayer with respect to the CARDS Loan – the first in which the taxpayer agrees to assume a share of the loan in conjunction with the purchase of a relatively small percentage of the foreign currency obtained by the foreign borrower, and the second in which the taxpayer agrees to be jointly and severally liable for the entire CARDS Loan to establish his full basis in that loan.

[9] Crispin says that "aircraft industry transactions are conducted in the [sic] U.S. Dollars, so the conversion of Swiss Francs to U.S. dollars was a business necessity" (Appellant's Opening Br. at 10), and that the amount of Swiss

In August 2002, Zurich notified Croxley and Crispin that it was exercising its right to terminate the CARDS Loan. The collateral securing Murus's guarantee was transferred to Croxley, which used it, together with the remainder of the loan proceeds held by Zurich, to repay the loan. The Croxley loan ended up lasting approximately one year, which was typical of the CARDS Loans that Zurich provided to Chenery clients.[10]

In April 2002, prior to filing his and Murus's 2001 tax returns, Crispin engaged Pullman & Comley, LLC ("Pullman"), a law firm that provided opinion letters for other Chenery clients, to provide a tax opinion regarding the CARDS transaction (the "Pullman Opinion"). The Pullman Opinion noted that the IRS had expressed negative views of the economic substance and other aspects of CARDS transactions. However, Pullman opined that Crispin's transaction "should have sufficient business purpose to be respected" by the IRS because "[t]he business purpose for [his] entering into the [t]ransactions is clear" and "[t]he financing available to [him] through the [t]ransactions has reduced [his] costs and has afforded [him] the ability to have

_____

francs that he purchased, when converted into U.S. dollars, "was the amount of financing need to acquire the Aircraft." (*Id.* at 9). There is no evidence in the record as to the proposed purchase price of the Aircraft.

[10] It was also typical of CARDS transactions Chenery engineered with another financial institution. *See Gustashaw*, 696 F.3d at 1131-32 (discussing the one-year actual duration of the CARDS loan provided in that case by a German bank that had participated in other Chenery CARDS transactions).

access to large amounts of capital on a long-term basis to operate the business of Murus." (Supplemental App. at 87.)

Murus listed a loss of $7.6 million on its 2001 tax return, the difference between its claimed basis (equal to Crispin's $9.4 million assumed share of the CARDS Loan, guaranteed by Murus) and the $1.8 million of proceeds it received from the currency exchange.[11]  That loss offset virtually all of Murus's income for 2001. As a result, Crispin reported only $3,244 of flow-through income from Murus on his personal income tax return for 2001.[12]

### B.     *Procedural History*

After the IRS discovered Crispin's CARDS transaction, the Commissioner disallowed the $7.6 million ordinary loss deduction that Murus had taken.  In July 2007, the Commissioner sent Crispin a notice of deficiency for the 2001 tax year that required payment of an additional $3.1

---

[11] Before he filed his 2001 tax return, Crispin was advised by Chenery of an IRS program that would have allowed him to avoid penalties if he voluntarily disclosed his participation in a CARDS transaction.  Crispin chose not to do so.

[12] Murus, as an S-corporation, is a "flow-through" entity for tax purposes, pursuant I.R.C. § 1361.  *See United States v. Tomko*, 562 F.3d 558, 576 n.14 (3d Cir. 2009) (en banc) (noting that the shareholders of a "'flow-through' Subchapter S Corporation" are required to include their share of the company's income, deductions, losses and credits in their personal income tax returns).

million of taxes and a $1.2 million penalty. Crispin filed a timely appeal with the Tax Court for a redetermination of his 2001 taxes.

In March 2012, the Tax Court issued a memorandum opinion affirming the Commissioner's determination that Crispin was not entitled to an ordinary loss deduction from his participation in the CARDS transaction and that he was liable for the accuracy-related penalty under I.R.C. § 6662. The Court found that the CARDS transaction lacked economic substance because Crispin had no valid business purpose and had tax-avoidance as his primary motivation.[13] It further held that Crispin was liable for a 40 percent penalty for underpayment that results from a gross valuation misstatement, pursuant to I.R.C. § 6662(h)(1), and that Crispin was not entitled to relief from the penalty under the exception applicable to taxpayers who rely on expert tax advice reasonably and in good faith, pursuant to I.R.C. § 6664(c)(1).

This timely appeal followed.

---

[13] The Tax Court's decision that Crispin's CARDS transaction lacked economic substance is consistent with that Court's other CARDS cases, all of which have disallowed deductions associated with those transactions. *See Kipnis v. Comm'r*, Nos. 30370-07, 30373-07, 2012 WL 5371787 (U.S. Tax Ct. 2012); *Gustashaw v. Comm'r*, 102 T.C.M. (CCH) 161 (2011), *aff'd*, 696 F.3d 1124 (11th Cir. 2012); *Kerman v. Comm'r*, 101 T.C.M. (CCH) 1241 (2011), *appeal pending*, No. 11-1822 (6th Cir.); *Country Pine Fin., LLC v. Comm'r*, 98 T.C.M. (CCH) 410 (2009).

## II. Discussion[14]

"While we conduct plenary review of the Tax Court's legal conclusions, we review its factual findings, including its ultimate finding as to the economic substance of a transaction, for clear error." *ACM P'ship v. Comm'r*, 157 F.3d 231, 245 (3d Cir. 1998). "[T]he Commissioner's deficiency determination is entitled to a presumption of correctness and ... the burden of production as well as the ultimate burden of persuasion is placed on the taxpayer." *Anastasato v. Comm'r*, 794 F.2d 884, 887 (3d Cir. 1986).

Crispin argues that the Tax Court erred when it disallowed the deduction that Murus claimed based on the CARDS transaction and thus held him liable for a deficiency for the 2001 tax year. He also contends that, even if he is liable for the deficiency, the Tax Court erred when it upheld the Commissioner's imposition of the accuracy related penalty under I.R.C. § 6662. We address each of those contentions in turn.

_____

[14] Because Crispin resided in the United States Virgin Islands when he filed his petition for review by the Tax Court, the Court noted that an appeal in Crispin's case would lie in this Circuit, and then followed our law in reaching its decision. Crispin sought review by the Tax Court pursuant to I.R.C. §§ 6211, 6212. We have jurisdiction under I.R.C. § 7482(a)(1).

13

A.    *The Liability Decision*

Crispin argues that the Tax Court erred in determining that his CARDS transaction lacked economic substance because the Court misapplied the pertinent analytical test and failed to credit testimony that Crispin had a valid business purpose in using the CARDS Loan.  In particular, Crispin alleges that the business purpose of the CARDS Loan was to provide long-term financing for the purchase of aircraft to be used in Murus's leasing business.

Section 165 of the Internal Revenue Code provides that "[t]here shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." I.R.C. § 165(a).  However, "[o]nly a bona fide loss is allowable.  Substance and not mere form shall govern in determining a deductible loss." Treas. Reg. § 1.165-1(b).   For a loss to be bona fide, it must therefore satisfy the economic substance doctrine, among other requirements.[15]  "The economic substance doctrine ... applies where the economic or business purpose of a transaction is relatively insignificant in relation to the comparatively large

_____

[15]    The Commissioner has also questioned the deductibility of Crispin's CARDS loss under several other provisions of the Code, including whether the loss from a currency transaction was ordinary or capital, under I.R.C. § 988, and whether Crispin was "at risk" for the amount of the deducted loss, as required by I.R.C. § 465.  Because the Tax Court did not address those arguments, and because we agree that Crispin's CARDS transaction fails to satisfy the economic substance doctrine, we do not address the Commissioner's other arguments.

tax benefits that accrue (that is, a transaction ... which exploit[s] a feature of the tax code without any attendant economic risk) ... ." *Neonatology Assocs., P.A. v. Comm'r*, 299 F.3d 221, 231 n.12 (3d Cir. 2002) (citation and internal quotation marks omitted).  "[I]n that situation, where the transaction was an attempted tax shelter devoid of legitimate economic substance, the doctrine governs to deny those benefits." *Id.*

"The inquiry into whether the taxpayer's transactions had sufficient economic substance to be respected for tax purposes turns on both the objective economic substance of the transactions and the subjective business motivation behind them." *ACM P'ship v. Comm'r*, 157 F.3d 231, 247 (3d Cir. 1998) (internal quotation marks omitted).  Indicia of objective economic substance include whether the loss claimed was real or artificial, *Stobie Creek Invs., LLC v. United States*, 608 F.3d 1366, 1377 (Fed. Cir. 2010), whether the transaction was "part of a prepackaged strategy marketed to shelter taxable gain," *id.* at 1379, and "whether the transaction has any practicable economic effects other than the creation of income tax losses," *Jacobson v. Comm'r*, 915 F.2d 832, 837 (2d Cir. 1990).  The subjective intent inquiry focuses on whether the taxpayer entered into the transaction intended  to serve a useful business purpose, *see ACM P'ship*, 157 F.3d at 252-54; *Lerman v. Comm'r*, 939 F.2d 44, 49 (3d Cir. 1991), and on the "correlation of losses to tax needs coupled with a general indifference to, or absence of, economic profits," *Keeler v. Comm'r*, 243 F.3d 1212, 1218 (10th Cir. 2001).

The Tax Court found that Crispin's CARDS transaction failed both the objective and subjective tests for economic substance.  The Court noted that Crispin

15

experienced only a paper loss of $7.6 million,[16] and that, after the CARDS Loan was repaid, Crispin experienced no consequences other than receiving the tax deduction. As a result, the Court concluded that "[t]he ordinary loss claimed from the CARDS transaction was fictional" (App. at 27), which it noted was "the hallmark of a transaction lacking economic substance." (*Id.* at 28.)

As to Crispin's stated business purpose, the Tax Court determined that both the structure of the CARDS transaction and the record belie Crispin's contention that he engaged in the transaction to obtain long-term financing for use in his aircraft leasing business. Although the Zurich loan had a stated 30-year maturity, the proceeds remained in Zurich's complete possession and control as collateral for the loan, and Zurich had the ability to call the loan at any time after the first year, which it in fact did. Also, Crispin never took any action to obtain and use the proceeds of the loan, knowing that he would have to post an offsetting amount of cash collateral. Nor did he ever take any steps to secure Zurich's approval to substitute aircraft for cash as collateral for the loan. Finally, there was no potential for profit, because the interest rate charged on the CARDS Loan was greater than the interest paid on the proceeds deposited as collateral at Zurich. Based on the foregoing, all of which is well-supported by the record, we see no error, let alone clear error, in the Tax Court's

---

[16] The Tax Court noted that the true net cost of the CARDS transaction to Crispin was only $72,926, primarily the structuring fee paid to Chenery and the cost of the Pullman Opinion. The ordinary loss actually reported by Murus, by comparison, was $7,641,706.

ultimate finding that Crispin's CARDS transaction lacked economic substance.

Crispin objects to the Tax Court's conclusion that much of his testimony on the business purpose of his CARDS transaction was not credible. In particular, the Court discounted his testimony that he had approached Zurich about substituting aircraft for cash as collateral for the CARDS Loan, and that he had received assurances from Zurich that it would consider such a change. Evidently that testimony – as well as expert testimony regarding the potential profit that could be generated by using the CARDS Loan proceeds to purchase aircraft – were unimpressive, because the Court found that Crispin did not actually plan to pursue the substitution of collateral. Crispin's protestations of unfairness in that finding ring hollow. Assessing whether "taxpayers' fact witnesses testified incredibly with regard to material aspects of th[e] case, and that their testimony ... was self-serving, vague, elusive, uncorroborated, and/or inconsistent with documentary and other reliable evidence" constitutes the kind of "credibility determinations ... ensconced firmly within the province of a trial court, afforded broad deference on appeal." *Neonatology Assocs.*, 299 F.3d at 229 n.9 (internal quotation marks omitted). In this case, there was ample documentary and testimonial evidence that contradicted Crispin's account of the business purpose of his CARDS transaction, and the Tax Court did not abuse its discretion in deciding not to credit Crispin's evidence.

B.    *The Penalty Decision*

Crispin argues that, even if we affirm the Commissioner's disallowance of the deduction that he took

17

based on his CARDS transaction loss, he ought not be liable for the gross valuation misstatement penalty. He contends that "[t]he overvaluation penalty should only be applicable where there is an underpayment attributable to an inflated value of an asset within the meaning of the penalty," and that the Tax Court failed to make the requisite finding as to how he had improperly inflated, *i.e.*, overstated, the value of the asset claimed in his 2001 tax return. (Appellant's Opening Br. at 56 (citing *Todd v. Comm'r*, 862 F.2d 540, 543 (5th Cir. 1988), and *Gainer v. Comm'r*, 893 F.2d 225, 228 (9th Cir. 1990); Reply at 19.) Crispin also contends that, even if the valuation misstatement penalty would normally apply, he is entitled to relief because he relied in good faith on the Pullman Opinion. Both of those arguments fail.

### 1. Applicability of the Valuation Misstatement Penalty

Section 6662 of the Internal Revenue Code imposes a 20 percent penalty with respect to underpayment that results from a "substantial valuation misstatement," which includes a misstatement of "basis" if "the adjusted basis of any property[] claimed on any return of tax imposed by chapter 1 is 200 percent or more of the amount determined to be the correct amount of such . . . adjusted basis."[17]   I.R.C.

---

[17] With exceptions not relevant in this case, "[t]he basis of property shall be the cost of such property ... ." I.R.C. § 1012(a). Typically, the "cost" of an asset "is equal to the cost to the taxpayer of acquiring the asset." *Muserlain v. Comm'r*, 932 F.2d 109, 114 (2d Cir. 1991); *see also Parsons v. United States*, 227 F.2d 437, 438 (3d Cir. 1955) (noting that "cost to the taxpayer [is] represented by the taxpayer's

§ 6662(b)(1)-(3), (e)(1)(A). That section goes on to increase the penalty to 40 percent if the taxpayer claims an adjusted basis in the property that is 400 percent or more of the correct amount; this is known as a "gross valuation misstatement." *Id.* § 6662(h). We have held that, "where a claimed tax benefit is disallowed because it is an integral part of a transaction lacking economic substance, the imposition of the valuation overstatement penalty is properly imposed ... ." *Merino v. Comm'r*, 196 F.3d 147, 159 (3d Cir. 1999).[18]

---

outlay" (internal quotation marks omitted)); *supra* note 3 (recognizing that the taxpayer's acquisition cost can under certain circumstances include the seller's liabilities).

[18] Our sister circuits are divided as to whether the valuation misstatement penalty applies to tax deductions that have been totally disallowed under the economic substance doctrine. *Compare Fidelity Int'l Currency Advisor A Fund, LLC v. United States*, 661 F.3d 667, 671-75 (1st Cir. 2011) (holding that the penalty is applicable), *Zfass v. Comm'r*, 118 F.3d 184, 190 (4th Cir. 1997) (same), *Gilman v. Comm'r*, 933 F.2d 143, 151 (2d Cir. 1991) (same), *and Massengill v. Comm'r*, 876 F.2d 616, 619-20 (8th Cir. 1989) (same), *with Heasley v. Comm'r*, 902 F.2d 380, 383 (5th Cir. 1990) (holding that when the IRS totally disallows a deduction, the underpayment is "not attributable to a valuation overstatement" but rather to claiming an improper deduction), *Gainer v. Comm'r*, 893 F.2d 225, 228 (9th Cir. 1990) (same), *and Todd v. Comm'r*, 862 F.2d 540, 543 (5th Cir. 1988) (holding that the penalty was inapplicable when the deficiency was not due to overstated basis but to a failure to place property into service). However, Crispin's reliance on *Todd* and *Gainer* is misplaced because they do not state the

19

law of this Circuit. *See Merino v. Comm'r*, 196 F.3d 147, 157-159 (3d Cir. 1999) (holding that the valuation misstatement penalty applies to property acquired in a transaction found to lack economic substance and expressly declining to follow *Todd* and *Heasley*).

Our reasoning as to the applicability of the valuation misstatement penalty finds support in the recent decision of the United States Court of Appeals for the Eleventh Circuit in *Gustashaw*, *supra.* In that case, the taxpayer conceded the tax deficiency that the Commissioner had assessed as a result of the disallowance of a CARDS Loan loss, so the economic substance issue was not before the Court, but the taxpayer contested the penalties. Applying the "majority rule," the Eleventh Circuit held that the 40 percent penalty applies "even if the deduction is totally disallowed because the underlying transaction, which is intertwined with the overvaluation misstatement, lacked economic substance." 696 F.3d at 1136. Also, the Fifth and Ninth Circuits "have questioned the wisdom of their positions" in *Todd*, *Heasley*, and *Gainer* because those positions create the "anomalous result" of relieving a taxpayer of the penalty when a deduction is disallowed because it is so egregious that it is improper for a reason other than valuation, such as a lack of economic substance, *See Bemont Investments, L.L.C. ex rel. Tax Matters Partner v. United States*, 679 F.3d 339, 355 (5th Cir. 2012) (Prado, J., concurring) (noting that the "*Todd/Heasley* rule," by "[a]mplifying the egregiousness of the scheme – to the point where the transaction is an utter sham – could ... , perversely, shield the taxpayer from liability for overvaluation"); *Keller v. Comm'r.*, 556 F.3d 1056, 1061 (9th Cir. 2009) (recognizing that the rule as expressed in most Circuits, including *Merino*, is a "sensible method of resolving

20

In this case, it is not entirely clear how the Tax Court determined the correct basis of the "asset" at issue, namely the "loan assumption proceeds" (App. at 27), even though it did conclude that Crispin made a gross valuation misstatement when he claimed $9.4 million in adjusted basis for that asset on his 2001 tax return. There are two ways one might think about a basis determination and the consequent amount of a valuation overstatement in a CARDS transaction, both of which provide grounds for affirmance. *Cf. ACM P'ship*, 157 F.3d at 249 n.33 (noting that a court of appeals may affirm a decision of the Tax Court on any grounds supported by the record, regardless of the Tax Court's rationale).

One way is to take the entire CARDS Loan for which the taxpayer agreed to be jointly and severally liable ($9.4 million in Crispin's case) and ask what it cost the taxpayer to enter into that loan. That cost, which may be viewed as representing the taxpayer's basis, *see supra* note 17, can rightly be seen in the CARDS context as limited to the value of the foreign currency actually purchased by the taxpayer and exchanged for U.S. dollars ($1.8 million here).[19] The

overvaluation cases" because it "cuts off at the pass what might seem to be an anomalous result – allowing a party to avoid tax penalties by engaging in behavior one might suppose would implicate more tax penalties, not fewer[,]" but acknowledging that, "[n]onetheless, in this circuit we are constrained by *Gainer*").

[19] The $1.8 million also represents the fair market value of the asset (i.e., the foreign currency) that Crispin actually purchased in his CARDS transaction. The basis in

21

amount of the valuation misstatement is thus the difference between the basis that Murus claimed on its 2001 tax return and that cost. (The difference is the $7.6 million deduction claimed by Murus and disallowed by the Commissioner, resulting in an equivalent upward adjustment in Crispin's taxable income.) *Cf. Merino*, 196 F.3d at 151 (noting that the parties had stipulated that the fair market value of the asset (which the Court appears to have used as a proxy for cost basis) was less than $50,000).

Another way to consider a CARDS loan is not as one transaction but as two closely related transactions: first, the purchase and exchange of the foreign currency (for which the taxpayer actually assumed liability, *see supra* note 8) and second, the agreement to be jointly and severally liable for the amount of the CARDS Loan in excess of that purchase. Focusing only on the second CARDS-related transaction, the basis is zero because that part of the transaction plainly lacks economic substance. Therefore, the overstatement is the full amount of the basis attributable to that second transaction (again, in this case, the $7.6 million deduction disallowed by the Commissioner.) *Cf. Gustashaw*, 696 F.3d at 1133 (noting that "a basis of zero ... is the correct amount when a transaction lacks economic substance").

property may be limited to its fair market value, rather than to the taxpayer's outlay, "where a transaction is not conducted on at arm's-length by two economically self-interested parties or where a transaction is based upon 'peculiar circumstances' which influence the purchaser to agree to a price in excess of the property's fair market value." *Lemmen v. Comm'r*, 77 T.C. 1326, 1348 (1981) (quoting *Bixby v. Comm'r*, 58 T.C. 757, 776 (1972)) (internal quotation marks omitted).

The amount of the valuation misstatement and of the deduction disallowed in this case are the same under either approach, and the explanation of the tax deficiency that the Commissioner sent to Murus alludes to both approaches. (*See* Supplemental App. at 135 (disallowing the $7.6 million deduction because the "transaction as a whole lacks economic substance"); *id.* at 125 (concluding that "the taxpayer's basis should be limited to the fair market value of the assets received rather than the full loan amount")). But the calculation of the *percentage* overstatement is not the same – $9.4 million divided by $1.8 million under the first approach, and $7.6 million divided by $0 under the second. The latter calculation, of course, results in an undefined percentage overstatement which the Commissioner treats as meeting the 400 percent threshold. *See* Treas. Reg. § 1.6662-5(g) (providing that the "adjusted basis claimed on a return of any property with a correct ... adjusted basis of zero is considered to be 400 percent or more of the correct amount[] ... and the applicable penalty rate is 40 percent"). For purposes of this case, then, either calculation yields an overstatement of more than 400 percent, so that the 40 percent penalty under I.R.C. § 6662 applies. Consequently, we need not, and do not, decide which is the correct or better approach, though we urge the Commissioner to clarify his interpretation of the law on this point.

In either case, because the underpayment in Crispin's taxes is directly traceable to the inflated basis in the loan assumption proceeds, that underpayment is "attributable to" a valuation misstatement of over 400 percent, and the 40 percent penalty is applicable to Crispin's underpayment of his 2001 taxes.

*2.     Reasonable Reliance on the Pullman Opinion*

I.R.C. § 6664(c) provides relief from the underpayment penalties in the form of a "reasonable cause exception" pursuant to which "[n]o penalty shall be imposed under section 6662 ... with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."  I.R.C. § 6664(c)(1).  "The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Treas. Reg. § 1.6664-4(b)(1).  "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." *Id.*

The facts and circumstances of this case demonstrate that there was nothing reasonable about Crispin's reliance on the Pullman Opinion to immunize him from the underpayment penalty.  Prior to Crispin's filing his 2001 tax return, the IRS, in its Notice 2002-21, 2002-1 C.B. 730 (Mar. 18, 2002), told taxpayers that losses on CARDS transactions could not be deducted from ordinary income.  The Pullman Opinion specifically referred to Notice 2002-21 and advised Crispin that the IRS had "concluded that no loss was allowable in the circumstances described therein ... ." (Supplemental App. at 82; *see also id.* at 83 (advising Crispin that Notice 2002-21 designated CARDS as "listed transactions" on which "the Service may impose various penalties").)  Crispin's "experience, knowledge, and

24

education," *see* Treas. Reg. § 1.6664-4(b)(1), as a former CPA and chief financial officer also strongly suggest enough familiarity with tax matters that he should be expected to have understood the warnings that Pullman included in the opinion.[20]

Furthermore, "[w]hile it is true that actual reliance on the tax advice of an independent, competent professional may negate a finding of negligence [for purposes of § 6662], the reliance itself must be objectively reasonable in the sense that the taxpayer supplied the professional with all the necessary information to assess the tax matter ... ." *Neonatology Assocs.*, 299 F.3d at 234. In particular, the advice on which the taxpayer claims reasonable reliance must not be based on an "inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner." Treas. Reg. § 1.6664-4(c)(1)(ii). That standard is not met here because, as the Pullman Opinion itself makes clear, Pullman based its opinion on a series of misrepresentations by Crispin.

For example, Crispin represented to Pullman that the business purpose of the transaction was to reduce borrowing costs and to afford Crispin "the ability to have access to large amounts of capital on a long-term basis to operate the

---

[20] Litigation in which Crispin was involved prior to the current lawsuit also indicates that Crispin is knowledgeable about tax matters generally and about tax shelters in particular. *See CMA Consol., Inc. v. Comm'r*, 89 T.C.M. (CCH) 701 (2005) (disallowing most of the deductions associated with a tax shelter used by Crispin in the early 1990's).

25

business of Murus." (Supplemental App. at 87.) However, Crispin knew or should have known that that representation was false, given that aircraft were not approved as collateral, which would have been necessary for Murus to make use of the CARDS Loan, and further given that the loan was in essence a one-year revolving credit facility callable at any time after the first year. Crispin also represented to Pullman that "[n]either Chenery nor any other party provided any tax related promotional material to [him] prior to [his] entering into" the CARDS transaction. (Supplemental App. at 79.) But Chenery founder Hahn had presented a CARDS transaction proposal to Crispin that included promotional materials describing the associated tax benefits, as well as a sample tax opinion. When a taxpayer relies on advice that is based on the taxpayer's own misrepresentations, that reliance is neither reasonable nor in good faith.[21] *See* Treas. Reg. §

[21] The Tax Court also found that "the record does not reflect that petitioner actually relied on the tax opinion" because "[Crispin] received the finalized opinion after the 2001 tax returns for [Crispin] and Murus were filed." (App. at 33.) Crispin points out that, although the final Pullman Opinion was dated April 29, 2002 (two weeks after he had filed his 2001 returns), the stipulated record contains an April 12, 2002 engagement letter to which a draft opinion letter had been attached, with the understanding that the final letter would be backdated to April 12. The Tax Court concluded that, because no draft of the Pullman Opinion was in the record, Crispin could not show that the factual assumptions and analysis in the draft on which Crispin claims reliance were the same as those in the final Pullman Opinion. Because we conclude that Crispin's reliance on the Pullman Opinion was neither reasonable nor in good faith, we need not

1.6664-4(b)(1) ("Reliance ... on the advice of a professional tax advisor or an appraiser does not necessarily demonstrate reasonable cause and good faith.").

## III.  Conclusion

"When, as here, a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril." *Neonatology Assocs.*, 299 F.3d at 234. Crispin gambled at CARDS and lost, and he is liable for both the underpayment of his taxes and the accuracy-related penalty as determined by the Commissioner.

Accordingly, we will affirm the decision of the Tax Court.

address this issue.