T.C. Memo. 2014-26

UNITED STATES TAX COURT

ESTATE OF HELEN P. RICHMOND, DECEASED, AMANDA ZERBEY,
EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE,
Respondent

Docket No. 21448-09.                    Filed February 11, 2014.

At the time of her death, D owned a 23.44% interest in a
family-owned personal holding company ("PHC"), whose assets
consisted primarily of publicly traded stock. D's estate tax return
reported the fair market value of D's interest in PHC as $3,149,767,
using a capitalization-of-dividends method to value the asset. R used
instead a net asset value ("NAV") method and determined a
deficiency in D's estate tax as well as an accuracy-related penalty
under I.R.C. sec. 6662.

Held: The fair market value of D's 23.44% interest in PHC is
better determined by an NAV method and is $6,503,804.

Held, further, P is liable for a 20% accuracy-related penalty
under I.R.C. sec. 6662(a), (b)(5), and (g).

[*2] <u>Peter Samuel Gordon</u> and <u>John W. Porter</u>, for petitioner.

<u>Warren P. Simonsen</u>, for respondent.

CONTENTS

FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Pearson Holding Company. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    PHC's maximizing of dividends. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    PHC's BICG tax liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    PHC stock transactions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Ms. Richmond's ownership and bequest of PHC stock. . . . . . . . . . . . . . . 9
    Financial information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    The estate tax return. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    The notice of deficiency and the petition. . . . . . . . . . . . . . . . . . . . . . 14
    The Commissioner's expert. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    The estate's expert. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    Ultimate findings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

OPINION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    I.     Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    II.    General principles of estate tax valuation. . . . . . . . . . . . . . . . . . 20
    III.   Choice of valuation method. . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    IV.   The value of the decedent's interest in PHC. . . . . . . . . . . . . . . . . 27

        A.     Discount for BICG liability. . . . . . . . . . . . . . . . . . . . . 28

            1.     Notice of deficiency: a zero discount. . . . . . . . . . . . . 28
            2.     The estate's expert: 100% of the BICG tax. . . . . . . . . 29
            3.     The Commissioner's expert:
                  43% of the BICG tax. . . . . . . . . . . . . . . . . . . . . . . . 32
            4.     Our conclusion:
                  present value of the BICG tax liability. . . . . . . . . . . . 35

[*3]   B.   Discount for lack of control. . . . . . . . . . . . . . . . . . . . . . . . . 39
      C.   Discount for lack of marketability. . . . . . . . . . . . . . . . . . . . 42
      D.   Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

   V.   Accuracy-related penalty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, <u>Judge</u>:  By a statutory notice of deficiency dated June 12, 2009, the Internal Revenue Service ("IRS") determined a deficiency of $2,854,729 in Federal estate tax due from the Estate of Helen P. Richmond.  The IRS also determined an accuracy-related penalty of $1,141,892 due under section 6662.[1] The estate commenced this suit by filing its petition to challenge those determinations.  The issues for decision are:

(1)  whether the 23.44% interest (consisting of 548 shares) in Pearson Holding Co. ("PHC") that was included in the value of the gross estate for purposes of Federal estate tax had a fair market value of $5,046,500 (as the estate

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (26 U.S.C.) in effect at the date of the decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Numerical amounts appearing in this opinion are sometimes rounded.

[*4] now asserts) or any other amount less than the $7,330,000 that the Commissioner now asserts (we find it had a value of $6,503,804);[2] and

(2) whether there is an underpayment of estate tax attributable to a substantial estate tax valuation understatement for purposes of the 20% accuracy-related penalty imposed by section 6662(a), (b)(5), and (g),[3] and, if so, whether any portion of the underpayment was attributable to "reasonable cause" under section 6664(c) (we find a substantial valuation understatement for which there was no reasonable cause).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. At the time of her death, Ms. Richmond resided in Pennsylvania. At the time the petition was filed,

---

[2]The IRS's notice of deficiency determined that the asset at issue had a fair market value not of $3,149,767 as the estate had reported on its return but rather $9,223,658--i.e., an increase of $6,073,891. The Commissioner now contends it had a value of $7,330,000 (i.e., about 20% less than on the notice of deficiency, and a concession of about 31% of the original increase). The estate tax return reported a value of $3,149,767, but the estate now contends it had a value of $5,046,500 (i.e., about 60% more than on the return).

[3]In the notice of deficiency, the IRS calculated the amount of the penalty using the 40% rate that generally applies to gross valuation misstatements. See sec. 6662(h). On brief, however, the Commissioner concedes that the 40% gross valuation misstatement penalty does not apply; and he asserts instead that the underpayment is attributable to a substantial valuation understatement under section 6662(b)(5) and (g), thus incurring a 20% penalty.

**[\*5]** the two co-executors of the estate resided in Pennsylvania (where the will was probated) and New Jersey.[4]

Pearson Holding Company

PHC was incorporated in Delaware in January 1928. It originated as and continues to be a family-owned investment holding company. PHC is a subchapter C corporation. Its business purpose as stated in its certificate of incorporation is "to guarantee, purchase, hold, sell, assign, transfer, mortgage, pledge or otherwise dispose of shares of capital stock, or any bonds, securities or other evidence of indebtedness created by anyone in the corporation or corporations organized under the law of the state of government". PHC's approach, as described by its current chairman and president, is "to preserve

---

[4]Under section 7482(b)(1)(A) this case would be reviewed on appeal by "the United States court of appeals for the circuit in which is located * * * the legal residence of the petitioner". To the extent the estate "reside[s]" where its co-executors reside or where the will was probated, this case would be reviewed on appeal by the Court of Appeals for the Third Circuit. Neither party has suggested any reason that appeal might lie in the Court of Appeals for the Fifth Circuit or the Court of Appeals for the Eleventh Circuit, both of which, see Estate of Jelke v. Commissioner, 507 F.3d 1317 (11th Cir. 2010), vacating and remanding T.C. Memo. 2005-131; Estate of Dunn v. Commissioner, 301 F.3d 339, 353 (5th Cir. 2002), rev'g and remanding T.C. Memo. 2000-12, have held that a holding company's net asset value should be discounted by 100% of the built-in capital gains tax for which the holding company would eventually be liable. See part IV.A.2 below.

[*6] capital, to grow capital where possible, and to maximize dividend income for the family shareholders".

As of December 2005 PHC had 2,338 shares of common stock outstanding. Those shares were held by 25 members whose interests ranged from 0.17% to 23.61%. The three largest shareholders (which included the decedent) owned a total of 59.20% of the shares.

PHC's maximizing of dividends

Through the date of the decedent's death, PHC followed its stated philosophy of maximizing dividend income. As a holding company subject to tax on undistributed income, see sec. 541, PHC has a strong incentive to pay out most of the dividend income generated by the securities held in its portfolio, and the ultimate objective of the company was to provide a steady stream of income to the descendants of Frederick Pearson while minimizing taxes and preserving capital. PHC has paid dividends reliably at a rate that, in the years from 1970 through 2005, had grown slightly more than 5% per year. In the seven years preceding the decedent's death, PHC paid out dividend distributions as follows:

[*7]

| Year | Dividend distribution | Decedent's share |
|------|-----------------------|------------------|
| 2005 | $1,077,000 | $252,436 |
| 2004 | 1,047,658 | 245,559 |
| 2003 | 1,016,469 | 238,248 |
| 2002 | 947,030 | 221,973 |
| 2001 | 922,575 | 216,241 |
| 2000 | 1,185,974 | 277,979 |
| 1999 | 835,578 | 195,850 |

The turnover of PHC's securities has been slow--for the period from 2000 to 2005, 1.1% per year; and for the 10-year period ending December 31, 2005, 1.4% per year. At that 1.4% rate, a complete turnover of the securities would take 70 years.

However, in 2005 a potential investor would have observed that, with the passing decades, the ownership of PHC stock had become more diffuse--and would continue to become more diffuse--among heirs and legatees with less and less identification with Frederick Pearson and his philosophy and goals, and with less and less knowledge of and affinity for one another. The mindset of the shareholders as owning a family company would more and more give way to an attitude that regards the PHC shares simply as an investment, and the company

**[\*8]** would be increasingly likely to follow the financial advice of diversifying its holdings. We find that, as the Commissioner's expert witness testified, a potential investor who considered purchasing PHC would likely expect that approximately 20-30 years would pass before a complete turnover of the portfolio or a liquidation of the company would occur.

PHC's BICG tax liability

When securities or any other assets appreciate in value, the owner becomes liable for tax--but only upon the occurrence of an income tax recognition event, such as the sale of the assets. A holding company that owns securities that both produce dividends and appreciate may prefer to hold the securities, rather than sell them, because it can thereby defer payment of the tax and accrue dividends from a larger portfolio, undiminished by payment of tax liabilities. This has been PHC's approach. As a result, the value of its portfolio has grown to consist more and more of untaxed appreciation. As of December 2005, 87.5% of the value of PHC's portfolio consisted of appreciation on which capital gain tax had not yet been paid but would eventually become due upon sale of the appreciated securities. (This deferred liability that inheres in appreciated assets is referred to as "built-in capital gain tax" ("BICG tax").)

[*9]   From time to time, Wilmington Trust Co., as PHC's financial adviser, has suggested that PHC sell substantial amounts of its securities in order to diversify its portfolio.  However, PHC never acted on this advice because of the large BICG tax attributable to the appreciation of its securities.  PHC has preferred not to incur that tax liability, the payment of which would diminish its total assets and therefore its ability to generate dividends.

PHC stock transactions

From 1971 through 1993, there were nine transactions involving the sale or redemption of PHC stock by a shareholder.  It appears that the value of the stock for those transactions was determined using the dividend model.  In addition, when another shareholder died in 1999, the estate used the dividend model to value his interest in PHC.

Ms. Richmond's ownership and bequest of PHC stock

As of December 2005, Helen P. Richmond owned 548 shares in PHC.  She was PHC's second largest shareholder, holding a 23.44% interest.  As the owner of less than a majority of PHC's stock, Ms. Richmond could not unilaterally change the management or investment philosophy of the company; nor could she unilaterally gain access to the corporate books, increase distributions from the company, or cause the company to redeem its stock.  She could not force PHC to

[*10] make an S election or to diversify its holdings. She had no rights to "put" her stock to the company (i.e., to force it to buy her shares), and the company could not "call" her stock (i.e., could not demand to buy it).

On February 10, 2004, Ms. Richmond executed a codicil to her will that named John W. Lyle and Amanda Zerbey as co-executors of her estate. Mr. Lyle graduated in the 1950s from LaSalle University in Philadelphia and was a certified public accountant (C.P.A.) in the State of Delaware. Mr. Lyle served as an accountant for PHC from 1970 until 2008. Before working at PHC, Mr. Lyle had been employed as an accountant at Haskin & Sells in their Philadelphia office. Ms. Zerbey attended business school at the Keystone School of Business from 1977 to 1978. Ms. Zerbey has been employed as an Internet operations quality control manager at Eastwood Co. in Pottstown, Pennsylvania, since 1993. Before her position at Eastwood Co., Ms. Zerbey was employed from 1973 to 1993 in Malvern, Pennsylvania, as a buyer for Cottage Craft, where she met Ms. Richmond.

Ms. Richmond died on December 10, 2005. The parties stipulate that on that date she still owned her PHC stock, so it is not disputed that the value of that stock is included in her taxable estate.

**[*11]** Financial information

The parties have stipulated that, as of December 10, 2005, PHC held a portfolio with a value of $52,159,430, as follows:

| Asset | Fair market value |
|---|---|
| Government bonds and notes | $976,939 |
| Preferred stocks | 188,449 |
| Common stocks[1] | 50,690,504 |
| Cash and equivalents | 294,161 |
| Receivables | 8,868 |
| Security deposit | 509 |
| Total | 52,159,430 |

[1]PHC's common stocks were invested in 10 major industries with 42.8% of the stock concentrated in four companies: Exxon Mobil (15.7%), Merck & Co., Inc. (11%), General Electric Co. (8.1%), and Pfizer, Inc. (8%).

As is noted above, approximately 87.5% of the $52,159,430 of PHC's total assets--i.e., $45,576,677--consists of unrealized appreciation. The parties agree that the capital gain tax liability "built in" to that appreciation (but not yet due) was $18,113,083.

As of the date of the decedent's death, PHC had outstanding liabilities (apart from any BICG tax liability) of $45,389. Accordingly, PHC had a net asset value ("NAV") of $52,114,041 (i.e., $52,159,430 in total assets less $45,389 in liabilities).

**[*12]** The estate tax return

On September 20, 2006, the co-executors of the decedent's estate, Amanda Zerbey and John W. Lyle,[5] filed a Form 706, "United States Estate (and Generation-Skipping Transfer) Tax Return". Before doing so, the estate retained a law firm to prepare the estate tax return and retained the certified public accounting firm of Belfint, Lyons & Shuman, P.A. ("Belfint"), to value the PHC stock for purposes of the estate tax return. The accountant who did the valuation was Peter Winnington.

Mr. Winnington graduated with a bachelor of science degree in accounting from the University of Delaware in 1971, and he received his master of science degree in taxation from Widener University in 1983. Mr. Winnington has been employed as an accountant with Belfint since October 1986, and he currently chairs the firm's corporate service department and sits on the firm's executive committee. Mr. Winnington has experience in public accounting involving audits, management advisory, litigation support and tax planning, and preparation services. Mr. Winnington became a C.P.A. in the State of Delaware in 1975 and a certified financial planner in 1988, and is a member of the American Institute of

---

[5]Ms. Zerbey is the surviving executrix of the decedent's estate as Mr. Lyle died on January 8, 2010.

[*13] Certified Public Accountants (AICPA), the Delaware Society of Certified Public Accountants (DSCPA), and the Wilmington Tax Group. Mr. Winnington has appraisal experience (i.e., having written 10-20 valuation reports and having testified in court), but he does not have any appraiser certifications.

The co-executors provided to Mr. Winnington information about stock transactions in the 1990s, as well as some valuations for prior estates that included PHC stock, which Mr. Winnington used to value the decedent's interest in PHC. Using this information, together with additional information already in Belfint's possession (i.e., audit reports, corporate tax returns, and investment reports of PHC, as well as knowledge of the history of the company and the pattern for its shareholders to hold their stock long term), Mr. Winnington prepared a draft report that valued the decedent's interest in PHC at $3,149,767, using a capitalization-of-dividends method. He provided the unsigned draft of the valuation report to the executors and to the return preparer, and he was never asked to finalize his report. Without further consultation with Mr. Winnington, the estate reported the value of Ms. Richmond's interest in PHC as $3,149,767 on the Federal estate tax return filed with the IRS.

**[\*14]** <u>The notice of deficiency and the petition</u>

On June 12, 2009, the IRS issued a statutory notice of deficiency to the estate, determining an upward valuation of the decedent's interest in PHC to $9,223,658.[6]  This adjustment increased the estate tax liability by $2,854,729.  In addition, the notice of deficiency determined a 40% gross valuation misstatement penalty of $1,141,892 pursuant to section 6662(h).  The notice of deficiency made no other adjustments to the gross estate besides the valuation of the decedent's interest in PHC.

The estate timely filed a petition with this Court, seeking a redetermination of the deficiency and the penalty determined in the notice of deficiency.

<u>The Commissioner's expert</u>

At trial the Commissioner offered John A. Thomson as an expert in business valuation.  The Court accepted Mr. Thomson as a business valuation expert and received his written report into evidence as his direct testimony.  Mr. Thomson valued the decedent's interest in PHC by the cost approach, using a discounted net asset method.  Using PHC's stipulated NAV of $52,114,041, Mr. Thomson

---

[6]The notice of deficiency does not specify what valuation method the IRS auditor used to value the decedent's interest in PHC and does not explain to what extent, if any, his method allowed discounts (for tax attributable to built-in gain, for lack of control, or for lack of marketability).

**[*15]** calculated the decedent's 23.44% interest of PHC's NAV to be $12,214,925[7] (i.e., 23.44% of the total NAV). He then applied a discount of 6% to adjust for the fact that the decedent held only a minority interest, and he applied a discount of 36% to adjust both for the lack of marketability of non-publicly traded shares and for the BICG tax.[8] Overall, Mr. Thomson applied a 40% discount,[9] resulting in the value of the decedent's 23.44% interest in PHC being reduced to $7,330,000.[10]

---

[7]Although the Court independently calculates the decedent's 23.44% interest to be $12,215,531 (i.e., $52,114,041 times 0.2344) instead of $12,214,925, we ignore this difference as de minimis.

[8]Of Mr. Thomson's 36% "marketability" discount, 15% was a discount for BICG tax. In his report prepared before trial, Mr. Thomson's discount for lack of marketability (including BICG tax) was set at 35%, but at trial he increased it to 36%.

[9]Mr. Thomson's overall discount can be expressed by this equation: discount for lack of control + [(1 - discount for lack of control) x (discount for lack of marketability)] = 0.06 + [(1-0.06) x (0.36)] = 0.3984, or 40%.

[10]The Commissioner's expert report asserts a value of $7,451,104, rounded to $7,450,000. However, the adjustment in the lack of marketability discount made at trial (i.e., increasing it from 35% to 36%) reduced the Commissioner's asserted value of the decedent's 23.44% interest in PHC to $7,330,000.

**[*16]** <u>The estate's expert</u>

The estate offered Robert Schweihs as an expert in valuation.[11] The Court

accepted him as an expert in business valuation and received his written report

into evidence as his direct testimony. Mr. Schweihs valued the decedent's interest

in PHC by relying primarily on the capitalization-of-dividends method, an income

approach.[12] In so doing, Mr. Schweihs used a dividend growth model, which

computes a principal value ("PV") as follows:

$$PV = E_0 (1 + g) / [k - g]$$

where:

$E_0 =$    Expected amount of economic income in the period
       immediately past
$k =$    Discount rate (or required rate of return)
$g =$    Expected growth rate of earnings, annually compounded
       into perpetuity

---

[11]In addition to calling Mr. Schweihs as an expert witness, the estate also called as a fact witness Mr. Winnington, the accountant who prepared PHC's valuation report for the estate tax return. Although Mr. Winnington gave factual testimony about his valuation report, which formed the basis for the value reported on the estate tax return, the estate did not proffer Mr. Winnington as a valuation expert and instead requests that we adopt Mr. Schweihs's appraised value.

[12]The Commissioner does not dispute that the capitalization-of-dividends method can sometimes be used to value stock, and does not dispute Mr. Schweihs's equation, but does dispute both the appropriateness of using that method in this instance and the appropriateness of some of the values Mr. Schweihs used. <u>See</u> part III below.

**[\*17]** Using a discount rate (k) of 10.25%, a long-term growth rate (g) of 5%, and the decedent's share of PHC's dividends in 2005, <u>see</u> p. 6 above, as the $E_0$, Mr. Schweihs valued the decedent's interest in PHC as of December 10, 2005, to be $5,046,500, as follows:

$$PV = \$252,436 \, (1 + 0.05) \, / \, [0.1025 - 0.05]$$

$$= \quad \$265,058 \quad / \quad .0525$$

$$= \quad \$5,048,724^{13}$$

Therefore, notwithstanding the estate's starting valuation of $3,149,767 (as reported on the estate tax return) and the Commissioner's starting valuation of $9,223,658 (as determined in the notice of deficiency)--with a difference of more than $6 million--by the time of trial, the difference in valuations had narrowed considerably:  The decedent's interest in PHC was worth $5,046,500 according to the estate and $7,330,000 according to the Commissioner--a difference of not quite $2.3 million.

As an alternative to his capitalization-of-dividends valuation, Mr. Schweihs also valued the decedent's interest in PHC using the net asset valuation method (i.e., proposing corrections to Mr. Thomson's net asset valuation) and reached a

---

[13]We are unable to reconcile Mr. Schweihs's value of $5,046,500 with the calculation above of $5,048,724.  We assume that the discrepancy is due at least in part to rounding, and we do not consider it to be material.

**[*18]** value of only $4,721,962. Starting with the same NAV as the

Commissioner's expert--$52,114,041--Mr. Schweihs reduced PHC's NAV by

$18,113,083--i.e., 100% of PHC's BICG tax (rather than the BICG discount of

$7,817,106--i.e., 15% of $52,114,041--that Mr. Thomson allowed). Mr. Schweihs

then applied an 8% discount for lack of control (as compared to Mr. Thomson's

6%), as well as a 35.6% discount for lack of marketability (as compared to

Mr. Thomson's 21%). This method valued PHC's net assets, after these discounts

and the dollar-for-dollar reduction for BICG tax, at $20,144,888. The decedent's

23.44% interest was therefore valued by the estate's expert at $4,721,962 using the

net asset value method.

Ultimate findings

We find that, in order to account for the capital gain tax liability built in to

its assets, PHC's net asset value of $52,114,041 should be discounted by

$7,817,106 (i.e., the Commissioner's concession of 15% of PHC's NAV) to

$44,296,935. We further find that the decedent's 23.44% interest therein (i.e.,

$10,383,202) should be further discounted by 7.75% for lack of control and by

32.1% for lack of marketability, so that the decedent's interest in PHC had a fair

market value of $6,503,804 at the decedent's date of death.

**[*19]**                                                    OPINION

I.    Introduction

We must determine the fair market value of the decedent's interest in PHC as of the date of her death.  The value of the decedent's interest was included in the value of her gross estate and was reported on the estate tax return at $3,149,767.  Relying on Mr. Schweihs' testimony, the estate now concedes a higher amount and argues that the correct fair market value is $5,046,500 (almost $2 million more).

In his notice of deficiency, the Commissioner valued the decedent's interest in PHC at $9,223,658.  Relying on Mr. Thomson's expert testimony, the Commissioner now argues that the fair market value is $7,330,000 (almost $2 million less), which we regard as a partial concession.  See Estate of Hinz v. Commissioner, T.C. Memo. 2000-6 (finding that the Commissioner conceded his valuation position as determined in the notice of deficiency by arguing for a lower fair market value on brief).

In general, the IRS's notice of deficiency is presumed correct, "and the petitioner has the burden of proving it to be wrong", Welch v. Helvering, 290 U.S. 111, 115 (1933); see also Rule 142(a); Crispin v. Commissioner, 708 F.3d 507, 514 (3d Cir. 2013), aff'g T.C. Memo. 2012-70; but in this case the estate argues

[*20] that the burden of proof has shifted. However, both sides put on expert testimony as to the value of the property at issue, and we are able to decide that value on the preponderance of the evidence. We therefore need not address the allocation of the burden of proof with respect to the valuation issue.

II.    General principles of estate tax valuation

Section 2001(a) imposes a tax on "the transfer of" a decedent's taxable estate, and section 2001(b) provides that the tax is imposed on "the amount of the taxable estate". The value of the gross estate includes the value "at the time of his death of all [the decedent's] property, real or personal, tangible or intangible, wherever situated." Sec. 2031(a); United States v. Cartwright, 411 U.S. 546, 550-551 (1973). For this purpose, "value" means "fair market value", which is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." 26 C.F.R. sec. 20.2031-1(b), Estate Tax Regs.

Valuation is ultimately a question of fact. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). If the property to be valued is stock of a closely held corporation, "actual arm's-length sales of such stock in the normal course of business within a reasonable time before or after the valuation date are

[*21] the best criteria of market value." Estate of Andrews v. Commissioner, 79

T.C. 938, 940 (1982); see also 26 C.F.R. sec. 20.2031-2(a) through (c). If it is not

possible to value the stock by such sales, "then the fair market value is to be

determined by taking * * * into consideration * * * the company's net worth,

prospective earning power and dividend-paying capacity, and other relevant

factors"; and "the weight to be accorded such * * * evidentiary factors * * *

depends upon the facts of each case." Id. para. (f)(2). "[I]n general, an

asset-based method of valuation applies in the case of corporations that are

essentially holding corporations, while an earnings-based method applies for

corporations that are going concerns." Estate of Smith v. Commissioner, T.C.

Memo. 1999-368; see also Rev. Rul. 59-60, sec. 5(a), 1959-1 C.B. 237, 242. The

parties disagree about whether that generality is correct in this case.

The parties rely principally on expert testimony to establish the fair market

value of the decedent's interest in PHC. Courts routinely consider expert

witnesses' opinions in deciding such issues; however, we are not bound by the

opinion of any expert witness and may accept or reject such testimony in the

exercise of our sound judgment. Helvering v. Nat'l Grocery Co., 304 U.S. 282,

295 (1938); Estate of Newhouse v. Commissioner, 94 T.C. at 217. Although we

may accept an expert's opinion in its entirety, we may instead select what portions

[*22] of the opinion, if any, to accept. Parker v. Commissioner, 86 T.C. 547, 562 (1986); Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980). Because valuation involves an approximation, "the figure at which we arrive need not be directly traceable to specific testimony if it is within the range of values that may be properly derived from consideration of all the evidence." Estate of Heck v. Commissioner, T.C. Memo. 2002-34.

The parties disagree over: (1) the appropriate valuation method to be used-- either the capitalization-of-dividends approach or the NAV approach--and (2) the appropriate discounts if the NAV approach is used. We now address those issues.

III.    Choice of valuation method

To value the decedent's interest in PHC, the Commissioner used the net-asset-value approach and the estate used the capitalization-of-dividends approach. We believe that the NAV approach better determines PHC's value.

The theory behind the income capitalization valuation method is that if an asset produces a predictable income stream, the market value of the asset can be ascertained by calculating the present value of that future income stream. PHC did have a history of reliably paying out dividends, and over the preceding 35 years its distributions had increased by about 5% per year. Predictable annual dividend payments were PHC's stated goal (and would presumably be the subjective

[*23] primary investment goal of someone purchasing a minority interest in PHC), so the estate used this method. The estate's expert assumed that that 5% annual increase in dividend payments would continue indefinitely. He determined that the market rate of return for a company with a comparable risk profile was 10.27% (rounded to 10.25%), and he assumed that PHC would realize that rate of return indefinitely. The estate's expert calculated the capitalization rate of 5.25% by subtracting the 5% annual dividend growth rate from the 10.25% market rate of return for a comparable risk investment. The estate's expert then divided the decedent's expected dividend return for the following year (i.e., $265,000 ($252,400 x 1.05)) by the capitalization rate (i.e., 5.25%), to calculate, for those future dividends, a present value of $5,046,500.

Dividend capitalization is one method for valuing a business; and this method may be entirely appropriate where a company's assets are difficult to value. For example, a company that does not hold a portfolio of publicly traded securities but instead operates a business may have assets--i.e., a conglomeration of tangible assets acquired and depreciated over a period of years and intangible assets (customer lists, assembled work force, know-how, etc.)--that are difficult to value. The business may seem to be more than the sum of its parts. In such a

**[\*24]** case, the value of the business may be better determined by projecting its income stream (and discounting it to present value).

However, by definition, the capitalization-of-dividends valuation method is based entirely on estimates about the future--the future of the general economy, the future performance of PHC, and the future dividend payouts by PHC--and even small variations in those estimates can have substantial effects on the value determined.[14]  The estate's valuation method therefore ignores the most concrete and reliable data of value that are available--i.e., the actual market prices of the publicly traded securities that constituted PHC's portfolio.  Of course, the net-asset-value method comes with its own difficulties and uncertainties (in this case, determining the amounts of the discounts discussed below), but the NAV method does begin by standing on firm ground--stock values that one can simply look up.

---

[14]In Shannon P. Pratt, Robert F. Reilly, and Robert P. Schweihs, Valuing a Business:  The Analysis and Appraisal 210 (4th ed. 2000), Mr. Schweihs and his colleagues state that the dividend capitalization approach to value is sensitive to the "constant annual income stream in perpetuity or a constant annualized rate of growth (or decline) in the economic income variable being capitalized in perpetuity.  Obviously, this constant growth rate projection is rarely met in the real world."  They observe, id. at 208, that the Gordon growth model is extremely sensitive to growth rate assumptions and that "[c]hanges in the growth rate projected, sometimes seemingly small, can result in striking changes."  In the example given in the estate's expert's book, a 1% change in assumed growth rate can result in more than an 11% change in the indicated value.

[*25] Moreover, the estate's valuation method assumes that the only thing a potential investor will consider when contemplating whether to buy PHC stock is the present value of the dividend stream that the stockholder can expect to receive. However, in December 2005 a potential investor would have known that--as the parties have stipulated--PHC's portfolio consisted primarily of securities whose values could have been computed without controversy to total $52 million, i.e., PHC's net asset value (before discounts) with which the Commissioner's method begins. Where the assets themselves are thus easily valued, valuing the holding company instead by the income approach would essentially overlook that fact, surely a relevant and helpful fact, which we think an investor was not likely to overlook but was instead likely to take as his starting point.

In addition, the Commissioner criticized the estate's use of a 10.25% expected rate of return, because the Ibbotson's study from which he derived that rate used a period (i.e., 1926-2004) that was different from the period Mr. Schweihs had used to calculate PHC's dividend growth rate (i.e., 1970-2004), and we believe the criticism is valid. To correct for this discrepancy, the Court independently calculated the actual rate of return (i.e., asset growth plus dividends paid) for PHC using PHC's historic data and found the compound annual growth rate to be not 10.25% but rather only 9.414%. We believe that in December 2005

**[*26]** a potential investor in PHC would have considered the post-1970 data most relevant and would have expected this rate of return, not the 10.25% rate of return assumed by the estate. When we correct the estate's calculation by using an expected rate of return of 9.414% and keeping the annual dividend growth rate constant at 5%, the present value of future dividends is about $1 million higher-- i.e., $6,005,000 (rounded)[15]--than as calculated by the estate. This confirms the sensitivity inherent in using the capitalization-of-dividends valuation method, which in our opinion makes it less reliable.

For such reasons, courts are overwhelmingly inclined to use the NAV method for holding companies whose assets are marketable securities. See, e.g., Estate of Litchfield v. Commissioner, T.C. Memo. 2009-21 ("With respect to stock in closely held real estate holding companies and investment companies such as LRC and LSC, the net asset valuation method is often accepted as the preferred method. Estate of Smith v. Commissioner, T.C. Memo. 1999-368; Estate of Ford v. Commissioner, T.C. Memo. 1993-580, affd. 53 F.3d 924 (8th Cir. 1995); Rev. Rul. 59-60 at sec. 5(b), 1959-1 C.B. 243").

---

[15]We note that the value of the decedent's interest in PHC calculated using the net asset value method ($6,354,519), as discussed below, is relatively close to the value of the decedent's interest in PHC using the capitalization-of-dividends method ($6,005,000), using the rate of return as corrected by the Court.

**[\*27]** The estate cites three cases to support its income capitalization valuation of holding companies--<u>Kohler v. Commissioner</u>, T.C. Memo. 2006-152; <u>Barnes v. Commissioner</u>, T.C. Memo. 1998-413; and <u>Estate of Campbell v. Commissioner</u>, T.C. Memo. 1991-615--but those cases are clearly distinguishable from the instant case. In each of those cases, the company to be valued held stock in a closely held operating company (not publicly traded stock) or was itself an operating company. As a result, the underlying assets of those companies were difficult to value.

PHC's primary assets, on the other hand, are marketable securities, which have ascertainable market values. Moreover, those market values inherently reflect the market's judgment as to the projected income streams of each stock and therefore reflect the future income stream of PHC. For that reason, a properly discounted net asset valuation of PHC indirectly takes into account the expected dividend stream that underlies the estate's valuation method. We therefore follow this Court's consistent precedent of using net asset valuations for companies with holdings like PHC.

IV. <u>The value of the decedent's interest in PHC</u>

The parties agree on the $52 million net asset value of PHC in December 2005; and although the estate does not agree that the NAV method is the more appropriate method, both parties agree in principle that, if the NAV

[*28] method is used, there must be discounts from that $52 million net asset value to account for (a) the BICG tax for which PHC would eventually be liable, (b) the lack of marketability of PHC's non-publicly traded shares, and (c) the lack of control inherent in the decedent's 23.44% interest in PHC.

### A. Discount for BICG liability

The parties agree that PHC's unrealized appreciation on its assets was $45,576,677, which if the assets had been sold on the date of death would have given rise to a capital gain tax liability of $18,113,083, assuming a 39.74% combined Federal and State tax rate. The parties further agree that the value of PHC should be discounted to some extent to account for the BICG tax attributable to that unrealized appreciation. However, the quantum of that discount is in dispute.

#### 1. Notice of deficiency: a zero discount

The IRS's notice of deficiency seems to make no discount for the BICG tax--a position that the Commissioner does not defend, and for good reason: An investor could have easily replicated PHC in December 2005 by contributing $52 million to his own new holding company and then having it purchase the very same types of securities that were in PHC's portfolio. No investor interested in owning such a company would have been indifferent to the fact that acquiring

[*29] PHC meant acquiring an eventual liability of $18.1 million. An investor would therefore have insisted on paying less than $52 million to acquire PHC; if PHC had offered no discount, an investor would simply buy the stocks and be better off. That is, the market would have required a discount, and any fair market valuation must reflect a discount.

### 2. The estate's expert: 100% of the BICG tax

On the other end of the spectrum, the estate contends that PHC's value should be discounted by 100% of the $18,113,083 BICG liability. To support this contention the estate relies on opinions by the Courts of Appeals for the Fifth and Eleventh Circuits[16] that have held that in a net asset valuation the value should be reduced dollar for dollar by the amount of a BICG tax liability. The Court of Appeals for the Fifth Circuit reasoned that "the starting point for the asset-based approach in this case is the assumption that the assets are sold, the starting point for the earnings-based approach is that the Corporation's assets are retained--are not sold", so consistent with that asset-based starting point, the built-in gain would

---

[16]See Estate of Jelke v. Commissioner, 507 F.3d 1317; Estate of Dunn v. Commissioner, 301 F.3d at 353; Estate of Jameson v. Commissioner, 267 F.3d 366 (5th Cir. 2001) (finding that the Tax Court improperly determined only a partial discount for capital gains tax liability inherent in a bequest of stock because the Tax Court failed to use a truly hypothetical willing buyer), vacating and remanding T.C. Memo. 1999-43.

**[*30]** give rise to a current tax liability reducing value. <u>Estate of Dunn v.</u>

<u>Commissioner</u>, 301 F.3d 339, 353 (5th Cir. 2002), <u>rev'g and remanding</u> T.C.

Memo. 2000-12.

However, other Courts of Appeals[17] and this Court[18] have not followed this

100% discount approach, and we consider it plainly wrong in a case like the

present one. The relevant inquiry is, of course, what price a willing buyer and

seller would agree to; and it is clear that they would not agree to a 100% discount.

To demonstrate this fact, PHC (with assets worth $52 million but burdened by an

$18.1 million BICG tax) can be compared to a hypothetical holding company

("HHC") that is identical to PHC except that HHC is burdened not by any BICG

tax but by an $18.1 million note payable that is due tomorrow. No investor would

be indifferent to this distinction and treat PHC and HHC as if they were

equivalent. The investor knows that, if he buys HHC, then tomorrow he must pay

---

[17]<u>Estate of Eisenberg v. Commissioner</u>, 155 F.3d 50, 59 n.16 (2d Cir. 1998) ("Where there is a relatively sizable number of potential buyers who can avoid or defer the tax, the fair market value of the shares might well approach the pre-tax market value of the real estate"), <u>vacating and remanding</u> T.C. Memo. 1997-483; <u>Estate of Welch v. Commissioner</u>, 208 F.3d 213, 2000 WL 263309, at *6 (6th Cir. 2000) (approving "the <u>Eisenberg</u> method of valuation"), <u>rev'g and remanding without published opinion</u> T.C. Memo. 1998-167.

[18]<u>See e.g.</u>, <u>Estate of Davis v. Commissioner</u>, 110 T.C. 530 (1998); <u>Estate of Jensen v. Commissioner</u>, T.C. Memo. 2010-182.

**[*31]** off the $18.1 million note and have a portfolio not of $52 million worth of

stock but only $34 million; and in the future--beginning tomorrow--he will receive

the capital gains and the dividends generated by that smaller $34 million portfolio.

On the other hand, the investor also knows that if instead he buys PHC, then he

may defer the payment of the $18.1 million BICG tax as long as he retains the

appreciated stock; in the future--until he sells off the appreciated stock over time

and incurs the tax piecemeal over that period--he will receive the capital gains and

dividends generated by the entire $52 million portfolio.  PHC is simply worth

more than HHC, because a prospective BICG tax liability is <u>not</u> the same as a debt

that really does immediately reduce the value of a company dollar for dollar.  A

100% discount, on the other hand, illogically treats a potential liability that is

susceptible of indefinite postponement as if it were the same as an accrued liability

due immediately.  We do not adopt this approach.[19]

---

[19]We do not face here a circumstance in which the facts about the assets and the market would make it inevitable that any informed buyer would expect to liquidate the company immediately and thus immediately bear the tax liability for the built-in gain.  Even if, in such a hypothetical case, the appropriate discount might be argued to be as much as 100% of the BICG tax, the facts in this case show that a rational buyer might intend (as PHC did intend) to continue to hold at least some the portfolio for a period of years, in order to benefit from the dividends generated by and the further appreciation experienced by the appreciated stock.  In a case like this one, therefore, a dollar-for-dollar discount is unwarranted.

[*32] It stands to reason that a potential buyer would be willing to pay more for a company with a contingent liability of $18.1 million than he would pay for a company otherwise equivalent but that had an unconditional liability of $18.1 million payable now. Likewise, the seller of the company with the contingent future liability would demand a higher price than the seller of a company with the unconditional current liability. As a result, despite contrary holdings by some courts, we find that a 100% discount would be unreasonable, because it would not reflect the economic realities of PHC's situation.

### 3. The Commissioner's expert: 43% of the BICG tax

The Commissioner's expert (Mr. Thomson) proposes a 15% discount for BICG tax, which at the entity level equates to $7,817,106 (i.e., 15% of the net asset value of $52,114,041 and 43% of the BICG tax liability of $18,113,083).[20]

---

[20]We note that the Commissioner's expert included the BICG discount as part of the lack of marketability discount that was applied at the individual level. We do not find that approach especially helpful in this case. As the BICG tax liability is a liability of the entity, which affects its net asset value, we find it appropriate to determine the BICG tax liability at the entity level. When subsequently applying the other discounts, we apply them seriatim (as Mr. Thompson did and as we approved in Estate of Magnin v. Commissioner, T.C. Memo. 2001-31, 81 T.C.M. (CCH) 1126, 1141 & n.35 (2001)), rather than simply adding the discount percentages together as a combined discount (as Mr. Schweihs did).

[*33] For reasons we now explain, we find his method[21] to be problematic, but we find his $7.8 million bottom line--which we take as a concession by the Commissioner--to be reasonable, for reasons different from those he advances.

To reach this $7.8 million BICG tax discount, Mr. Thomson analyzed the correlation between unrealized appreciation (i.e., built-in gain) and NAV discounts for closed-end funds as of December 31, 2004. He compiled data from closed-end funds with unrealized appreciation accounting for 11% to 46% of the total net asset value, and he was unable to find any statistical correlation between the BICG discount that could be observed on sales and the unrealized appreciation of the seven closed-end funds he examined. He therefore concluded that in the case of companies with unrealized appreciation that consists of as much as 46% of the company's value (which he rounds up to 50%), buyers are indifferent to the BICG tax liabilities on that appreciation when purchasing an interest in a closed-end fund. By Mr. Thomson's reckoning, then, a potential buyer would be indifferent to PHC's BICG tax to the extent it is attributable to the portion of its

---

[21]The Commissioner characterizes Mr. Thomson's method as "the method that was accepted in Estate of Davis" v. Commissioner, 110 T.C. 530 (1998). Mr. Thomson was the expert in Estate of Davis; he did use there a formula similar to what he uses here; and in Estate of Davis the Court did ultimately adopt a valuation close to that offered by Mr. Thomson. However, we see nothing in the Estate of Davis Opinion to endorse the particulars of Mr. Thomson's method.

[*34] unrealized appreciation that is equal to 50% of its $52,114,041 NAV (i.e., tax attributable to $26,057,021). PHC's unrealized appreciation accounts for $45,576,677 of its value (i.e., approximately 87.5% of the total NAV of $52,114,041), so the remaining appreciation (i.e., the amount of unrealized appreciation above 50% of NAV, or $45,576,677 less $26,057,021) is $19,519,656 (i.e., approximately 37.5% of NAV).

Mr. Thomson concluded that "a dollar-for-dollar discount over 50% of the tax exposure" was appropriate. This seems to mean that Mr. Thomson allowed a dollar-for-dollar discount for the tax attributable to the appreciation over 50% of PHC's NAV (i.e., a dollar-for-dollar discount for the tax attributable to $19,519,656 in appreciation, i.e., a discount of $7,757,111 when using a 39.74% combined Federal and State capital gains tax rate). Applying an effective tax rate of 39.74% to this gain equal to 37.5% of PHC's NAV (i.e., the portion of PHC's unrealized appreciation for which the tax liability would be afforded a dollar-for-dollar discount), Mr. Thomson figured that the allowable discount for BICG should be 14.9% (i.e., 39.74% times 37.5%), rounded up to 15%.[22]

---

[22]Since Mr. Thomson rounded this discount to 15%, we treat a BICG discount equal to 15% of PHC's NAV--or $7.8 million--as the Commissioner's concession.

[*35] This reasoning is not supported by the evidence. We are unconvinced that a buyer would be wholly indifferent to the tax implications of built-in gain that constitutes up to half of a company's assets. Furthermore, Mr. Thomson points to no data to show that, once a fund's unrealized appreciation exceeds 50% of its NAV, there would then begin to be a correlation between NAV discount and the unrealized appreciation above 50%; nor is there evidence that the discount would simply be dollar for dollar for the portion in excess of 50% and not something more--e.g., an increase in elasticity (price sensitivity) for BICG liability once it reaches a certain point. He presented no data at all concerning funds with built-in gain constituting more than 50% of NAV. As a result, we cannot endorse Mr. Thomson's approach to calculating the BICG discount, but we view the resulting discount amount--$7,817,106--to be a concession on the Commissioner's part.

### 4. Our conclusion: present value of the BICG tax liability

If (as we hold) the BICG tax liability cannot be disregarded in valuing PHC, but if (as we also hold) PHC's value cannot be reasonably discounted by that liability dollar for dollar, then the most reasonable discount is the present value of the cost of paying off that liability in the future. See Estate of Jensen v. Commissioner, T.C. Memo. 2010-182; Estate of Litchfield v. Commissioner, T.C.

[*36] Memo. 2009-21. The Commissioner's expert did not use this present value approach, because he observed that at PHC's historic rate for turning over its securities, it would take 70 years before all the stock had been sold and all the built-in gain had been taxed. If the $18.1 million of BICG tax were discounted over that period, on the assumption that PHC's stocks would be gradually sold and its BICG tax would be gradually incurred over 70 years (on an average of $258,758 per year), then the present value of the $18.1 million liability would be only $3,664,119 (assuming a 7% discount rate). However, this 70-year assumption would mistakenly allow PHC's unique, subjective investment goals to dictate the value of the company, whereas what we seek is a fair market value--the price at which PHC would change hands between a willing buyer and a willing seller, not the price that a particular seller might demand or that a particular buyer might be willing to pay, and therefore not a price that assumes subsequent management of the company by a specific owner.[23] As the estate rightly

---

[23] Admittedly, what we ultimately value here is not the entirety of PHC but rather a minority 23.44% interest in it; and it can be observed that the acquirer of a mere minority interest is bound to the investment decisions of the majority, and he might therefore suppose that PHC's philosophy and history portended a 70-year turnover period (and therefore a long deferral of the BICG tax, yielding a very small discount). However, this observation about the minority shareholder's being bound to the majority's investment decisions properly pertains to the quantum of the discount that must be made on account of the lack of control that a minority

(continued...)

[*37] acknowledged, "The willing buyer and the willing seller are hypothetical, not actual persons, and each is a rational economic actor; that is, each seeks to maximize his advantage in the context of the market that exists at the valuation date."[24] The advice that PHC received to diversify its portfolio (i.e., to sell stock more quickly than its 70-year trend would call for) indicates that a rational actor would expect a turnover period shorter than 70 years. PHC's decision not to follow that advice was not irrational, but it was particular to PHC's subjective goals. Even assuming that the PHC management would indefinitely follow its traditional philosophy and would sell stock only at the 70-year pace, and assuming that PHC shareholders would refuse to sell at prices that presumed a shorter turnover, that refusal would not affect the fair market value of PHC; it would

---

[23](...continued)
owner will experience (discussed below). The BICG tax for which we now determine a discount is, on the other hand, an entity-level attribute of PHC as a whole, and not of a particular interest in PHC. A purchaser of PHC stock might later owe capital gains tax if he sells that stock at a gain; but he will never be liable for tax on PHC's gains from the sale of its holdings.

[24]The Commissioner similarly explained: "For this purpose, fair market value is the price that a hypothetical willing buyer would pay a hypothetical willing seller * * *. The particular characteristics of these hypothetical persons are not necessarily the same as those of any specific individual or entity, and are not necessarily the same as those of the actual buyer or the actual seller."

[*38] instead indicate that PHC's particular managers and owners were willing to forfeit or forgo some of PHC's fair market value in order to pursue other aims.

The estate put on no evidence as to the length of the period that a typical investor would consider likely or optimal for turning over PHC's stock (apart from the general fact that PHC's advisors repeatedly suggested that PHC sell stock in order to diversify) but asserted only PHC's particular historic rate (yielding a 70-year turnover period and, to the estate's detriment, a relatively small $3.6 million BICG tax liability discount). Mr. Thomson's testimony on this score--i.e., that, notwithstanding PHC's historic turnover rate, a potential investor would expect that a portfolio like PHC's would turn over within a period of 20 to 30 years--is not rebutted, and we find it reasonable. A present-value approach that uses either a 20-year or a 30-year holding period and uses the different discount rates employed in various contexts in this case yields the following range of present values for the $18.1 million BICG:

[*39]

| Discount rate | 20 years | 30 years |
|---|---|---|
| 10.27%<br>(as calculated by P using<br>Ibbotson's data) | $7,570,358 | $5,565,937 |
| 10.25%<br>(as used by P in the<br>capitalization of<br>dividend model) | 7,580,584 | 5,575,086 |
| 9.414%<br>(as calculated by the<br>Court using PHC's<br>historic data) | 8,029,070 | 5,982,097 |
| 7%<br>(generally accepted rate<br>of return) | 9,594,513 | 7,492,200 |

Since the Commissioner's $7.8 million concession falls comfortably within this range of $5.5 to 9.6 million, we use that figure. As a result, on the basis of these findings and the record before us, we find a $7,817,106 BICG discount to be reasonable in this case.

B.    Discount for lack of control

A minority discount is a discount that a buyer would demand for the lack of control the buyer will have over how his investment will be managed (e.g.,

[*40] disposition of assets,[25] payment of distributions, or appointment of management). The parties agree that a discount for lack of control is proper if a net asset valuation is used in this case. However, the measure of that discount remains in dispute.

The Commissioner's expert used a data set consisting of the net asset values and trading prices of 59 closed-end funds for the week of December 9, 2005. He then analyzed the percentage difference between the net asset value and trading price (if negative, a discount; if positive, a premium). Overall, this methodology is sound and appears to be a reasonable way to calculate an appropriate discount associated with lack of control (though we find a correctable flaw in the data set itself).

The Commissioner's expert found the mean (i.e., the average) of the premiums and discounts of all 59 data points to be -6.7%. However, he did not use this number as the discount. Rather, he observed that the decedent and one

---

[25]A potential purchaser of a minority interest in PHC would observe certain disadvantages that might result from lack of control, such as an inability to overcome PHC's historic devotion to maximizing dividends when that approach might cause it to miss other opportunities that would produce not steady dividends but capital growth. Likewise, a minority shareholder in PHC would be unable to compel the company to follow professional advice and diversify optimally (though this approach has the corresponding advantage of deferring the BICG tax on PHC's appreciated holdings).

[*41] other owner each owned about 23% of PHC, and that the next largest

holding was only about 12%. His expert report therefore concluded that, even

though the decedent did not control the company, the decedent's 23.44% interest

was a large and influential block of PHC's stock, so that its lack of control was

somewhat mitigated, and he reduced the discount to -6.0% because of the "low

dispersion of the remaining ownership interest [in PHC] and ease of

management".[26] He did not explain how he chose -0.7% as the amount of the

appropriate reduction, and it appears to be simply a visceral reduction, for which

we do not see the justification.

The estate's expert used the same data but simply selected the median (i.e.,

the middle value) of the data set, -8.0%, as the appropriate discount because the

Commissioner's expert "incorrectly selected a number based upon

misinterpretation of the Factors identified in [Mr. Thomson's] * * * report", for

which he cited as a supposed example that "the holder of this interest cannot be a

---

[26]The phrase "ease of management" in his report may be shorthand for Mr. Thompson's reckoning (as explained in his testimony) that, because PHC engaged Wilmington Trust as its investment advisor, "we have a professional management here [at PHC] too, so it's not as if we just have a family doing everything by themselves". However, in pursuit of its distinctive (not to say eccentric) investment philosophy, PHC disregarded Wilmington Trust's professional advice to further diversify. It therefore appears that lack of control of PHC might indeed have had visible, continuing effects that might concern an investor (and might require a greater discount).

**[\*42]** Director." However, this example apparently reflects the estate's expert's erroneous assumption--corrected by the time of trial--that a PHC director must be a member of the Pearson family. Such a restriction might indeed aggravate lack of control (and might increase the appropriate discount), but it did not exist here.

An examination of the data set shows that among the 59 funds there are three outliers that skew the mean and whose relevance or reliability Mr. Thomson did not show. Removing these outliers--i.e., the highest two values and the lowest value[27]--yields a mean minority discount of -7.75%, which is comfortably close to the estate's 8.0% median. As a result, we conclude that a discount for lack of control of 7.75% is reasonable in this case.

## C.    Discount for lack of marketability

A prospective investor is likely to pay more for an asset that will be easy to sell and less for an asset that may be difficult to sell. In this case, PHC owns easy-to-sell publicly traded stocks; but we value an interest in PHC itself, which is a

---

[27]The highest two values reflect premiums of 28.3% and 38.2%, with the next highest premium being only 10.9%. These two remarkable premiums are unexplained in our record, and we cannot tell how they relate to the remainder of the data set nor what, if anything, they could suggest about the appropriate minority discount for a company like PHC. We therefore disregard them as outliers. At the other end of the spectrum, the lowest value reflects a discount of 25.9%. We disregard it as an outlier, since the next highest discounts are 17.1%, 17.0%, 16.7%, 16.5%, 16.4%, and 15.3%.

[*43] family-owned, non-publicly traded company the stock of which has no ready

market.  The parties agree that a marketability discount--i.e., a discount

attributable to the cost and difficulty of finding a willing buyer for a non-traded

closely held interest--is appropriate here if PHC is valued by a net asset valuation

method.  However, the quantum of that discount remains in dispute.

To determine the appropriate discount for lack of marketability, the

Commissioner's expert examined seven studies of restricted stock, which is

identical to freely traded stock of a public company except that it is restricted from

being traded on an open market for a certain period of time.[28]  The studies

compared two types of data:  (1) the selling prices of the restricted stocks with the

selling prices of the corresponding unrestricted shares, and (2) the selling prices of

shares in closely held companies at their pre-IPO level versus their subsequent

post-IPO price, and measured the difference between its restricted value and its

---

[28]The Commissioner's expert also examined but did not rely on studies comparing the sale price of closely held company shares to the prices of shares at subsequent initial public offerings of the same companies.  The estate argues that the Commissioner's expert is therefore subject to criticism as in Estate of Davis v. Commissioner, 110 T.C. 530, in which we discussed the limitations of restricted stock studies and gave more weight to IPO studies.  However, there is no absolute rule that, for purposes of determining a marketability discount, IPO studies are superior to restricted stock studies, since in other circumstances we have preferred the latter.  See Estate of Giustina v. Commissioner, T.C. Memo. 2011-141.  The estate's expert presented no analysis of IPO studies or of what discount they might suggest here, so the estate's argument does not convince us.

[*44] non-restricted value to quantify a discount for lack of marketability. The seven studies produce lack-of-marketability discounts ranging from 26.4% to 35.6%, with an average discount of 32.1%.

Mr. Thomson chose to use the very bottom of this range--26.4%--as his starting point for determining lack of marketability for PHC stock, because most of the studies dealt with stock in operating companies (inherently more risky than stock in a company that holds publicly traded shares). Mr. Thomson then further reduced the discount to 21% for various reasons--e.g., PHC paid consistent dividends; PHC had a very small amount of debt; and PHC was managed by professional investors. Although these reasons would likely warrant consideration, Mr. Thomson provided no basis for the quantum of the adjustment attributable to each. Furthermore, we are unconvinced that Mr. Thomson's low starting point--26.4%--was warranted because of his summary observation that most of the studies dealt with riskier operating companies.

Again, the estate's expert did not perform an independent analysis for lack of marketability. Instead, Mr. Schweihs accepted Mr. Thomson's general approach and data, but he simply chose the very top of the range of the study's marketability discounts--i.e., 35.6%--arguing that the seven studies that were used to derive this discount are based on entities whose stock (unlike PHC's) would

[*45] relatively soon be freely marketable. He contended that stock (like that in the seven studies) whose public trading is restricted for only a defined period (during which private trades may be made) may be less discounted in value than stock (like PHC's) whose non-public status is of indefinite duration.

The parties seem to agree that the general range of marketability discounts relevant for consideration in this case is 26.4 to 35.6%, with an average discount of 32.1%, and we are unconvinced by either party's rationale for deviating from this generality. We therefore find that a marketability discount of 32.1%--i.e., the average of the data sets--is reasonable in this case.

D. Conclusion

On the basis of the foregoing, we find that the value of the decedent's 23.44% interest in PHC at the time of her death is $6,503,804, figured thus:

[*46]

| | |
|---|---:|
| Assets of PHC | $52,159,430 |
| Less: Liabilities | - 45,389 |
| Less: BICG discount | - 7,817,106 |
| NAV of PHC | 44,296,935 |
| 23.44% Interest in NAV | 10,383,202 |
| Less: LOC discount (7.75% of $10,383,202) | - 804,698 |
| | 9,578,504 |
| Less: LOM discount (32.1% of $9,578,504) | - 3,074,700 |
| Value of decedent's interest in PHC | 6,503,804 |

V.     Accuracy-related penalty

Generally, a 20% penalty is imposed on "any portion of an underpayment of tax required to be shown on a return" where the underpayment is attributable to a substantial estate tax valuation understatement. Sec. 6662(a), (b)(5). An estate tax valuation understatement is treated as "substantial" where the value of any property required to be reported on an estate tax return is reported at 65%[29] or less

[29]The estate tax return at issue here was filed on September 20, 2006. Section 6662(g)(1) was amended for returns filed after August 17, 2006, to provide that a valuation understatement is substantial if the value of any property

(continued...)

[*47] of the correct value.  Sec. 6662(g)(1).  The Commissioner bears the burden

of production with respect to the penalty determined under section 6662.  See sec.

7491(c); Higbee v. Commissioner, 116 T.C. 438, 446 (2001).

The estate reported the value of the decedent's interest in PHC to be

$3,149,767 on the estate tax return.  Given that we have determined the proper

value of the decedent's interest in PHC was $6,503,804, the amount reported on

the estate tax return was less than 65% of the proper value, and a "substantial"

valuation understatement therefore exists for purposes of section 6662(g)(1).

Therefore, the Commissioner has met his burden under section 7491(c).

However, the 20% penalty under section 6662(a), (b)(5), and (g) will not

apply to any portion of an underpayment "if it is shown that there was a reasonable

cause for such portion and that the taxpayer acted in good faith with respect to

such portion."  See sec. 6664(c)(1) (emphasis added).  The regulations provide

that whether an underpayment of tax is made in good faith and due to reasonable

cause will depend upon the facts and circumstances of each case.  26 C.F.R. sec.

1.6664-4(b)(i), Income Tax Regs.  Reasonable cause may involve reliance on a

---

[29](...continued)
required to be reported on an estate tax return is reported at 65% or less of the
correct value.  Before August 17, 2006, that figure was 50%.  See Pension
Protection Act of 2006, Pub. L. No. 109-280, sec. 1219(a)(1)(B), 120 Stat. at
1083.

**[\*48]** professional tax advisor, but such reliance does not necessarily demonstrate reasonable cause and good faith, and "[r]easonable cause and good faith ordinarily is not indicated by the mere fact that there is an appraisal of the value of property." Id.

In determining whether a taxpayer acted reasonably and in good faith with regard to the valuation of property, factors to be considered include: (1) the methodology and assumptions underlying the appraisal; (2) the appraised value; (3) the circumstances under which the appraisal was obtained; and (4) the appraiser's relationship to the taxpayer or to the activity in which the property is used. Id. To establish good faith, taxpayers cannot rely blindly on advice from advisers or on an appraisal. Bergquist v. Commissioner, 131 T.C. 8, 23 (2008) (citing Kellahan v. Commissioner, T.C. Memo. 1999-210; and Estate of Goldman v. Commissioner, T.C. Memo. 1996-29).

Mr. Lyle, who was deceased at the time of trial, was the co-executor of the estate, was a C.P.A., and was primarily responsible for obtaining the valuation. Ms. Zerbey, the other co-executor, who attended business school and had some modest experience in financial matters, allowed Mr. Lyle to be the principal contact with the accountant (Mr. Winnington at the Belfint firm) who was retained to value the decedent's interest in PHC. Ms. Zerbey testified that Mr. Lyle kept

**[\*49]** her informed, and she knew that Mr. Winnington was selected to value the decedent's interest in PHC and that two prior valuations were being used as guidelines. According to Mr. Winnington, Mr. Lyle provided him with sufficient information to value the decedent's interest in PHC.

Mr. Winnington is a C.P.A. who is knowledgeable about PHC. Mr. Winnington testified that his fee was not contingent on the value he reached and that Mr. Lyle did not influence the value ultimately reported on the estate tax return. Although Mr. Winnington has some appraisal experience (i.e., having written 10-20 valuation reports and having testified in court), he does not have any appraiser certifications. The estate did not proffer him as an expert witness and did not demonstrate that he is qualified as an expert in valuation.

On the record before us, we cannot say that the estate acted with reasonable cause and in good faith in using an unsigned draft report prepared by its accountant as its basis for reporting the value of the decedent's interest in PHC on the estate tax return. Mr. Winnington is not a certified appraiser. The estate never demonstrated or discussed how Mr. Winnington arrived at the value reported on the estate return except to say that two prior estate transactions involving PHC stock used the capitalization-of-dividends method for valuation. Furthermore, the estate did not explain--much less excuse--whatever defects in Mr. Winnington's

[*50] valuation resulted in that initial $3.1 million value's being abandoned in favor of the higher $5 million value for which the estate contended at trial. Consequently, the value reported on the estate tax return is essentially unexplained.

The estate observes that four substantially different values were reached by four professionals--Mr. Winnington ($3.1 million), the estate's expert ($5 million), the Commissioner's expert ($7.3 million), and the IRS auditor ($9.2 million)--and the estate argues that this fact demonstrates the difficulty of valuing the decedent's interest in PHC. While we do not disagree with the estate's assertion that the decedent's interest in PHC may be difficult to value, we believe that this further supports the importance of hiring a qualified appraiser. In order to be able to invoke "reasonable cause" in a case of this difficulty and magnitude, the estate needed to have the decedent's interest in PHC appraised by a certified appraiser. It did not. Instead, the estate relied on the valuation by Mr. Winnington but did not show that he was really qualified to value the decedent's interest in the company. The $3.1 million value reported on the estate tax return was less than 65% of even the $5 million value defended by the estate's own expert; and if the Court had adopted the $5 million value, the return would still reflect a substantial valuation understatement that would warrant the accuracy-related penalty; that is,

[*51] even by the estate's lights, the value on the estate tax return needed explaining, but no explanation was given.

Given that the Commissioner has met his burden to show that the accuracy-related penalty applies, the burden shifted to the estate to show why it should be excused from the penalty. The estate failed to make such a showing. As a result, we find that the estate has not demonstrated that it acted with reasonable cause and in good faith in reporting the value of the decedent's interest in PHC on the estate tax return. As a result, the Commissioner's imposition of an accuracy-related penalty under section 6662(a), (b)(5), and (g) will be sustained.

Decision will be entered under

Rule 155.